1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

9
10
11

JANE M. DOROTIK,

Civil No.    07cv1007-J (POR)

12

Petitioner,

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE**
**JUDGE RE DENIAL OF PETITION**
**FOR WRIT OF HABEAS CORPUS**

13

vs.

14
15

DAWN DAVIDSON, Warden,

16

Respondent.

17        This Report and Recommendation is submitted to United States District Judge Napoleon

18   A. Jones, Jr., pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States

19   District Court for the Southern District of California.

## I.

## FEDERAL PROCEEDINGS

22        Jane M. Dorotik (hereinafter "Petitioner") is a California prisoner proceeding pro se with

23   a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging her San Diego

24   County Superior Court conviction for first degree murder.  (Doc. No. 1.)  Petitioner claims that

25   her conviction was obtained in violation of her federal Constitutional rights because she received

26   ineffective assistance of trial counsel, and because the prosecution withheld exculpatory

27   evidence.  (Memorandum of Points and Authorities in Support of Petition, Attachment A to

28   Petition ["Pet. Mem."] at 1-34.)

1   Respondent Warden Dawn Davidson (hereinafter "Respondent") has filed an Answer to
2   the Petition accompanied by a Memorandum of Points and Authorities in Support thereof.  (Doc.
3   No. 11.)   Respondent contends that habeas relief is unavailable in this Court because the
4   adjudication of claim one by the state courts did not involve an unreasonable application of
5   clearly established federal law, and because claim two is procedurally defaulted and without
6   merit.  (Memorandum of Points and Authorities in Support of Answer ["Ans. Mem."] at 7-34.)
7   Petitioner has filed a Traverse in which she requests an evidentiary hearing on her claims, and
8   argues that any procedural default should be excused.  (Doc. No. 17.)

9   For the following reasons, the Court finds that Petitioner is not entitled to habeas relief,
10  and recommends the Petition be denied.

**II.**

**STATE PROCEEDINGS**

13  In a one-count felony Complaint filed in the San Diego County Superior Court on
14  February 22, 2000, refiled as an Information on November 1, 2000, Petitioner was charged with
15  one count of premeditated murder in violation of Cal. Penal Code sections 187(a) and 189.
16  (Lodgment No. 1, Clerk's Tr. ["CT"] at 1-4.)  On June 12, 2001, a jury found Petitioner guilty
17  of murder, and separately found that the murder was premeditated.  (CT 323.)  On August 2,
18  2001, Petitioner was sentenced to twenty-five years-to-life in state prison.  (CT 497.)

19  Petitioner appealed her conviction, raising claims which are not presented here.
20  (Lodgment Nos. 3-5.)  The appellate court, in an unpublished opinion, affirmed the judgment
21  of conviction in all respects.  (Lodgment No. 6, People v. Dorotik, No. D038706 (Cal.Ct.App.
22  Nov. 18, 2003).)  Petitioner filed a petition for review in the state supreme court presenting the
23  same claims, which was summarily denied.  (Lodgment Nos. 7-8.)

24  Petitioner filed a habeas petition in the state superior court on April 4, 2005, presenting
25  the majority of the claims raised in her federal Petition here.  (Lodgment No. 9.)  That petition
26  was denied on the merits and on procedural grounds.  (Lodgment No. 10, In re Dorotik, No.
27  HCN0787 (Cal.Sup.Ct. Aug. 2, 2005).)  Petitioner presented the majority of the claims presented
28  here in a habeas petition filed in the appellate court on January 3, 2006.  (Lodgment No. 11.)

1    That petition was also denied on the merits and on procedural grounds.  (Lodgment No. 12, <u>In</u>

2    <u>re Dorotik</u>, No. D047784 (Cal. Ct.App. Sept. 2, 2005).)  Petitioner presented all of the claims

3    presented in the instant federal Petition in a habeas petition filed in the state supreme court on

4    November 20, 2006, which was denied without citation or a statement of reasoning.  (Lodgment

5    Nos. 13-14.)

6                                                          **III.**

7                                              **<u>UNDERLYING FACTS</u>**

8             The following statement of facts is taken from the appellate court opinion affirming

9    Petitioner's conviction on direct review.  This Court gives deference to state court findings of

10   fact and presumes them to be correct.  <u>See</u> <u>Sumner v. Mata</u>, 449 U.S. 539, 545-47 (1981) (stating

11   that deference is owed to factual findings of both state trial and appellate courts).

12            In February 2000 appellant and her husband Robert Dorotik (Robert) were
     living on a ranch they rented in a rural area near Escondido.  The pair had three
13   adult children.  Appellant and Robert frequently argued about money.  Appellant
     and daughter Claire were horse enthusiasts.  Robert disapproved of the money
14   spent by appellant to support that interest.  The couple was not particularly
     affectionate, sometimes discussed divorce, but never had a physical confrontation.
15
              In 1997 appellant and Robert separated.  Robert filed for divorce and
16   sought spousal support from appellant whose employment was considerably more
     remunerative.  The couple reconciled in 1998 and resided together at the ranch,
17   agreeing to keep their finances separate.  Their relationship was uneven and at
     times they argued.  Robert started a business but it did not do well.
18
              On the evening of February 13, 2000, appellant called friends and asked if
19   they had seen Robert.  Appellant explained Robert had gone for a run at 1:00 p.m.
     and had not returned.  Appellant called the sheriff and reported Robert missing.
20   A search was undertaken.  The next day a sweatshirt, which appellant stated
     Robert was wearing on his run, was found on a road about two miles from
21   appellant's home.  Shortly thereafter, Robert's body was found in brush next to
     a road about a half mile from where the sweatshirt was located.  Appellant was
22   notified.  She started to cry and asked if her husband had suffered.

23            It was determined that Robert died from blunt force injures to the head,
     with ligature strangulation as a contributing factor.  He suffered at least three
24   blows to the head.  He had two large lacerations at the right side and back of the
     head with skull fractures underneath those lacerations and direct damage to the
25   brain at the back of the head.  There was a depressed skull fracture on the right
     side of the head.  In the back of the head the bone was completely displaced and
26   there was a hole in the skull.  Robert had abrasions on his face and a ligature mark
     on his neck.  There were abrasions and contusions on his hands that appeared to
27   be defensive wounds.  Robert was alive when strangled.  An expert concluded the
     damage to Robert's head was consistent with hammer strikes.

28

The police interviewed appellant on February 13, 2000.  She told the officers that about 1:00 p.m. Robert told her he was going to jog.  She went to the barn and did not see him leave.  When she returned to the house at 4:00 p.m., Robert was not there.  When he had not returned by 5:00 p.m., she went out looking but could not find him.  She then called the police.  Appellant told the officers she and Robert each had a $250,000 life insurance policy with the other as beneficiary.

A search was conducted of appellant's residence.  Bloodstains were found in several areas in the master bedroom.  The patterning of some of the stains was consistent with a beating occurring in the room.  When officers turned over the mattress in the room, they found a large-volume bloodstain near the headboard.  There was a folded, bloodstained towel between the mattress and box springs.  In a bag in the master bedroom the officers found a syringe containing a horse tranquilizer.  A bloody fingerprint was found on one of the syringes.  The print was identified as appellant's.  A bed sheet was found in a hamper with transfer, drip and impact blood spatters on it.  A steam shampooer and cleaning supplies were found in a living room closet.  Blood was found on the handle, cap and nozzle of one of the bottles.  Bloodstains were also found in the bed of a truck used at the ranch. DNA testing indicated many of these bloodstains were consistent with Robert's blood.

An expert in bloodstain patterning opined that the events started on the bed in the master bedroom.  Robert was struck at least twice and perhaps a third time on the bed.  He remained on the bed for a time after the assault.  At some point Robert moved or was moved to another area in the bedroom where he was struck at least once more.  Robert remained in that area for some time.

The expert also examined the clothes from Robert's body.  There were transfer but no spatter stains on his T-shirt.  There was no blood on his sweatpants.  There were two bloodstains and a large amount of feces on Robert's boxer shorts.  There was no blood on his shoes.

Appellant did not testify.  She offered evidence suggesting that someone else killed Robert.

(Lodgment No. 6, People v. Dorotik, No. D038706, slip op. at 2-4.)

## IV.

## PETITIONER'S CLAIMS

(1) Petitioner's Sixth Amendment right to the effective assistance of counsel was violated when defense counsel failed to: (a) subject the prosecution's forensic evidence to meaningful adversarial testing and obtain readily available forensic evidence which would have challenged the prosecution's theory of the case and exposed the weakness of the prosecution's forensic evidence; (b) prepare and call Petitioner as a witness; (c) demonstrate that Petitioner was physically incapable of committing the murder as theorized by the prosecution; (d) obtain DNA testing on several items of physical evidence; (e) present alternate scenarios consistent with the

physical evidence; (f) provide innocent explanations for the apparently incriminating evidence; (g) present evidence that the police focused on Petitioner from the beginning of the investigation and failed to follow other leads which would have led them to the real killers; (h) engage in a reasonably competent investigation before pursuing an absurd theory that Petitioner's daughter was the killer; and (i) make good on promises to the jury regarding what the evidence would show, refrain from admitting to the jury that Petitioner was guilty, and refrain from stating that counsel personally did not believe in the evidence he presented at trial.  (Pet. Mem. at 1-31.)

(2)   The prosecution violated Petitioner's rights under the Fifth and Fourteenth Amendments, as those rights are interpreted in Brady v. Maryland, 373 U.S. 83, 87 (1963), by: (a) failing to provide and/or delayed providing police interviews of witnesses favorable to the defense; (b) failing to notify the defense of evidence that the prosecution's expert witness had made errors in other cases and had employed faulty methodology; (c) denying Petitioner's motion for a new trial which prevented the jury from hearing the testimony of exculpatory witnesses; and (d) failing to subject evidence to testing.  (Pet. Mem. at 32-34.)

## V.

## DISCUSSION

For the following reasons, the Court finds that the adjudication of claim one by the state courts was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts.  The Court also finds that claim two is procedurally defaulted, and that Petitioner has failed to establish cause, prejudice or a fundamental miscarriage of justice necessary to excuse the default, but that in any case the claim is without merit.  The Court therefore recommends the Petition be denied.

**A.    Standard of Review**

Title 28, United States Code, § 2254(a), sets forth the following scope of review:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C.A. § 2254(a) (West 2006) (emphasis added).

Under 28 U.S.C. § 2254(d):

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d) (West 2006).

A state court's decision may be "contrary to" clearly established Supreme Court precedent: (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. An unreasonable application may also be found, "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions." Williams, 529 U.S. at 412.

Habeas relief is also available if the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence

07cv1007

presented in state court."  28 U.S.C.A. § 2254(d)(2) (West 2006).  In order to satisfy this provision, Petitioner must demonstrate that the factual findings upon which the state court's adjudication of his claims rest, assuming they rest on a factual determination, are objectively unreasonable.  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

**B.    Claim One**

Petitioner contends in claim one that her right to the effective assistance of counsel was violated based on defense counsel's allegedly deficient performance in numerous instances detailed below.  (Pet. Mem. at 1-18.)  She also argues that counsel's deficient performance prejudiced her defense in numerous ways.  (Id. at 18-31.)  Respondent contends that the adjudication of Petitioner's ineffective assistance of counsel claim by the state courts was objectively reasonable because Petitioner has failed to show deficient performance by defense counsel, or that she was prejudiced from any of the alleged instances of deficient performance. (Ans. Mem. at 8-26.)

Petitioner presented claim one to the state supreme court in a habeas petition, which was summarily denied without a statement of reasoning or citation of authorities.  (Lodgment Nos. 13-14.)   She presented the same claim in a habeas petition filed in the appellate court. (Lodgment No. 11.)  The appellate court denied the claim on the merits in a written order. (Lodgment No. 12, In re Dorotik, No. D047784, slip op at 1-3.)  Petitioner also presented claim one to the superior court in a habeas petition.  (Lodgment No. 9.)  The claim was denied on the merits in a written order.  (Lodgment No. 10, In re Dorotik, No. HCN0787, slip op at 2-3.)

In Ylst v. Nunnemaker, 501 U.S. 797, 804 (1991), the Court adopted a presumption which gives no effect to unexplained state court orders but "looks through" them to the last reasoned state court decision.  The Court will look through the silent denial of claim one by the state supreme court to the appellate court order.  The appellate court addressed only those aspects of claim one involving forensic evidence and the failure to call Petitioner to testify, stating:

> Even if petitioner could show her attorney should have made a more thorough investigation of the forensic evidence, she has not shown that such investigation would have resulted in a reasonable probability of a different outcome at trial.  Petitioner's expert states that forensic evidence suggests the victim was beaten in the bedroom, but the fatal beating took place at another

location. This theory does not tend to show petitioner did not commit the murder. As to her argument if this evidence had been available, she would have testified, and her attorney was ineffective in not preparing her to do so, she has not indicated how further investigation would have encouraged her to testify, informed her testimony or how the result at trial would have been different had she done so.

(Lodgment No. 12, In re Dorotik, No. D047784, slip op at 2-3.)

The superior court also addressed only these two aspects of claim one. (Lodgment No. 10, In re Dorotik, No. HCN0787, slip op at 2-3.) Thus, with respect to the aspects of claim one alleging that defense counsel was deficient for failing to challenge the forensic evidence and in failing to prepare and call Petitioner to testify, the Court must determine whether the adjudication of the claim by the appellate court was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts. Because there is no state court opinion which provides a statement of reasons for the denial of the remaining aspects of claim one, the Court is required to conduct an independent review of the record to determine whether the state supreme court clearly erred in its application of controlling federal law when it denied the claim without a statement of reasoning. Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002); Greene v. Lambert, 288 F.3d 1081, 1089 (9th Cir. 2002) ("(W)hile we are not required to defer to a state court's decision when that court gives us nothing to defer to, we must still focus primarily on Supreme Court cases in deciding whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law.")

The clearly established United States Supreme Court law governing ineffective assistance of counsel claims is set forth in Strickland v. Washington, 466 U.S. 668 (1984). See Baylor v. Estelle, 94 F.3d 1321, 1323 (9th Cir. 1996) (stating that Strickland "has long been clearly established federal law determined by the Supreme Court of the United States"). For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must demonstrate two things. First, she must show that counsel's performance was deficient. Strickland, 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Second, she must show

-8-

07cv1007

counsel's deficient performance prejudiced the defense.  Id.  This requires showing that counsel's errors were so serious they deprived Petitioner "of a fair trial, a trial whose result is reliable."  Id.  To satisfy the prejudice prong, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. Williams, 529 U.S. at 406; Strickland, 466 U.S. at 694 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel can not be shown by a preponderance of the evidence to have determined the outcome.").  The prejudice inquiry is to be considered in light of the strength of the prosecution's case.  Luna v. Cambra, 306 F.3d 954, 966 (9th Cir.), amended, 311 F.3d 928 (9th Cir. 2002).

**1) Forensic evidence**

Petitioner first argues that her attorney was deficient for failing to subject the prosecution's forensic evidence to meaningful adversarial testing, and to obtain readily available forensic evidence which would have challenged the prosecution's theory of the case and exposed the weakness of the prosecution's forensic evidence.  (Pet. Mem. at 1.)  Petitioner states that the prosecution's theory of the case was that she killed her husband in their bedroom, moved the body to the pickup truck she owned, drove him to the spot the body was found, and dumped his body on ground, but asserts that a forensic report she obtained after her conviction, which is attached to the Petition as Exhibit 1, shows that it is more likely than not that the victim was killed at a location other than the bedroom.  (Id. at 4-5.)  She contends the post-conviction report concludes that: (a) there is less blood present in the bedroom than would be expected if the killing took place there; (b) the blood found on the mattress could have resulted from a nosebleed; (c) what were reported as blood stains could have been stains caused by rain; (d) there was not enough blood on the mattress to support the theory that the victim remained on the bed for a period of time after being hit multiple times; (e) the convergence of the blood spatter was below what was calculated by the prosecution's expert witness because the expert did not allow for the effect of gravity; and (f) further testing is required regarding the area around the potbelly stove in order to determine whether the stains there are related to the murder. (Id. at 5-7.)

Petitioner argues that she was prejudiced by counsel's failure to challenge the forensic evidence because the coroner's report concluded that the victim had lost more than half his blood volume, but that the small amount of blood found in the carpet cleaner could not have accounted for the volume of blood lost and there was no trace of blood in the plumbing system or on the porch, and in any case the victim had used the carpet cleaner after his recent nosebleed.  (Id. at 18-19.)  She also contends that the blood on a towel found under the mattress next to the blood stain contained DNA other than that of Petitioner or the victim, which has yet to be associated with anyone, and had it been tested it might have identified the real killer.  (Id. at 20.)  She argues that the act of removing the victim's shirt could have explained how a piece of the victim's scalp, which was found on his chest, got there, challenging the assumption that it was moved to his chest by the act of pulling a shirt over the victim's head when the victim's body was dressed after he was killed.  (Id.)

Respondent states that the post-conviction forensic evidence obtained by Petitioner consists of a letter from the Laboratory of Forensic Science signed by a "Forensic Associate" whose qualifications are not stated.  (Ans. Mem. at 25.)  Respondent argues that aside from the questionable nature of the scientific procedures used in the report, and aside from the fact that Petitioner has failed to demonstrate that her trial counsel did not conduct an adequate pre-trial forensic investigation, the post-conviction forensic report essentially corroborates the prosecution's theory of the killing, that the victim was attacked in the bedroom and the body moved to where it was ultimately found.  (Id.)  Respondent argues, consistent with the appellate court's conclusion, that even assuming Petitioner could demonstrate that death ultimately occurred where the body was dumped, it would in no way call into question her guilt.  (Id.)

Petitioner has failed to demonstrate that her trial counsel was deficient in challenging the forensic evidence presented at trial.  Petitioner admits that her trial counsel consulted an expert with respect to the forensic evidence seized by the prosecution, whom she identifies as "Lisa DiMeo."  (Pet. Mem. at 4.)  Petitioner contends, however, that this expert was so inexperienced and overwhelmed that she did not prepare a report, and that trial counsel should have consulted another expert when it became apparent that the expert could not complete the work.  (Id.)

-10-

Petitioner has provided no evidence that this expert was asked to write a report and failed to do so, or that she failed in any way in conducting the analysis requested by trial counsel. Rather, the record reflects that Petitioner's trial counsel received a report from an expert named Lisa DiMaio on April 27, 2001, well before trial started on May 15, 2001, "regarding her Luminol of the area, the carpeting, and then a very short paragraph on her conclusions regarding the tire impressions." (Lodgment No. 2, Reporter's Tr. ["RT"], vol. 1, May 1, 2001 at 12.) That report was provided to the prosecution by the defense through discovery prior to trial. (Id. at 13.) Petitioner has thus failed to demonstrate that trial counsel did not receive a report from DiMaio, has failed to demonstrate that DiMaio did not complete her work, has failed to show that defense counsel did not conduct an adequate investigation regarding the forensic evidence, and has not overcome the presumption that trial counsel made a strategic decision not to present expert forensic testimony at trial.

Even assuming Petitioner could demonstrate deficient performance by trial counsel in failing to retain a competent forensic expert, she is unable to show prejudice. Detective Lee Empson testified that Petitioner said she had last seen her husband at 1:00 p.m. or 1:30 p.m. on Sunday when he was preparing to go jogging, and that she spent the afternoon in the horse barn on the ranch she and her husband rented. (RT vol. 8 at 1156-59.) She told the detective that when she returned to the house at about 4:30 p.m., her husband was not there, that she became worried and drove around in her pickup truck looking for him, and when she could not find him, she called the police at 7:45 p.m. to report him missing. (Id.) A search of the area was conducted, and her husband's body was found at 4:36 a.m. on Monday, about two and one-half miles from their ranch. (Id. at 1161, 1167.) The body had abrasions on the head, cheek and nose, with a rope wrapped around the neck. (Id. at 1170.) There were tire impressions in the mud which ended about thirty feet from where the body was found, shoe impressions in the mud leading from where the tire tracks ended up to the body, and the brush leading from where the tire tracks stopped to where the body was found was matted down as if a sled or slide had been used to drag the body. (Id. at 1168, 1174-75, vol. 11 at 2048.) The victim's shoes appeared to have been tied by someone other than the victim, and there were no splash marks anywhere on

the victim's shoes or pants, indicating that the victim had not been out jogging, as the weather had been rainy and cold on Sunday afternoon, but had been killed elsewhere and his body dumped where it was found.  (RT vol. 8 at 1171-72.)  When the victim's shirt was removed, a piece of scalp with the hair attached was found on the victim's chest, a further indication he had been dressed after he was dead.  (Id. at 1179.)

Detective Empson and other detectives interviewed Petitioner at her home on Monday evening, along with her sons Alexander and Nicholas, and her daughter Claire.  (Id. at 1180-81.) The detectives found a length of rope similar to the rope found around the victim's neck, and were told by Claire that she had been out of town that weekend and had returned Sunday night. (Id. at 1182-86.)  The police impounded a black pickup truck from the residence of a farm worker employed part-time by Petitioner named Leonel Morales, because the tires on his truck appeared to match some of the tire tracks where the body was found.  (Id.)  Based on the autopsy, the police concluded the victim's death was a homicide and that he had been killed somewhere other than where the body was found.  Detectives Empson and Janet Ryzdynski searched Petitioner's house and ranch on Thursday morning with Petitioner's permission.  (Id. at 1188-91.)  They found what appeared to be blood in an area around a potbelly stove in the master bedroom, and noticed that the carpeting was wet in that area.  (Id. at 1193-95.)  Petitioner told them that the victim had had a nosebleed in that area about a week before and had cleaned it up, and that her dog had also bled in that area.  (Id. at 1194-95.)  Detective Empson saw blood spatter on the bedroom ceiling, the comforter, the pillow shams, the window and wall behind the bed, the headboard, the nightstand, and the telephone on the nightstand; he obtained a search warrant and requested that a criminalist examine the bedroom.  (Id. at 1200-04.)  A further search revealed more rope similar to that found around the victim's neck, a bed sheet in the laundry with blood stains, blood on the ceiling of a utility room directly under the track of a sliding door which led from the bedroom out to a patio, a syringe in the trash in the master bathroom with Petitioner's fingerprint in blood, blood in the bed of Petitioner's pickup truck, which also had mud smears on the steering wheel and gear shift, and what appeared to be a blood stain on the exterior wall of the staircase leading from the patio outside the bedroom down

to the ground floor next to where detectives found the piece of rope during the Monday visit. (Id. at 1205-15; vol. 13 at 2378.)

Charles Merritt, a police criminalist, testified that he examined the bedroom which Petitioner shared with the victim and found impact blood spatter stains on a pillow on the bed, the bedspread, the wall and window above the bed, the headboard, a nightstand, and a lamp sitting on the nightstand. (RT vol. 8 at 1308-23.) There was a volume blood stain which had been cleaned on the carpet next to a potbelly stove, two transfer blood stains on a leg of the stove, impact spatter stains on the stove and on the brick wall behind the stove, a volume stain on the grout behind the stove and in the track of a sliding glass door which opened to an outdoor patio, cast-off blood stains on the walls and ceiling of the bedroom, a volume stain on the underside of the mattress, and certain areas of the carpet were wet and appeared to have been recently cleaned. (Id. at 1323-36.) There was also a large amount of blood which had leaked through the tracks of the sliding door into the room below the bedroom, and a transfer stain about five feet up the outside wall at the bottom of the stairs leading down from the patio, near where the detectives found the rope. (Id. at 1337-39.) Blood was found on a bottle of cleaning fluid located next to a carpet shampooer in a closet, and blood spatter and transfer stains were found on a bed sheet in a laundry basket. (Id. at 1226-27, 1355.) DNA testing indicated that the victim was the source of the blood found in the bedroom, on the cleaning bottle, the syringe, the exterior wall at the base of the stairs, the bed of the truck, and the storage room beneath the bedroom, and that no DNA from Petitioner or Morales was found in the samples taken. (RT vol. 13 at 2372-73.)

The expert opined that the most likely sequence of events was that the victim was attacked as he was standing next to the bed, was hit on the head with a hammer or the blunt end of a hatchet two or three times, causing the spatter stains around the bed and cast-off stains on the ceiling; that the victim lay on the bed bleeding for some time, causing the large volume stain on the mattress; that he moved, or his body was moved, to the area near the potbelly stove, where he was struck in the head again at least once more, and that he lay bleeding there for some time, causing the spatter, impact and volume stains found in the area around the stove. (Id., at

1339-46.)  Because no blood spatter stains were found on the clothes the victim was wearing when his body was found, and there were transfer blood stains found on his t-shirt and socks, the expert opined that the victim had been dressed in the clothes he was found wearing after he had been attacked.  (Id. at 1346-56.)

The post-conviction forensic report provided by Petitioner does not call into question the prosecution's theory that the victim was attacked in the bedroom, dressed in the clothes he was found in after he had been killed or incapacitated, and dumped where the body was found. Rather, the report asks the question why there was not more brain matter or hair found in the bedroom if the victim was initially attacked there.  (Pet. Ex. 1 at 1.)  The evidence presented at trial was that a steam shampooer and cleaning supplies were found in a living room closet, that bloodstains were found on the handle, cap and nozzle of a cleaning bottle, and that Petitioner had the opportunity to clean the bedroom prior to its examination.  As set forth above, there was also a large-volume bloodstain found on the mattress near the headboard and evidence the carpet near the potbelly stove had recently been cleaned.  Even if Petitioner is to be believed that the bloodstain on the mattress was caused by a nosebleed and the victim used the carpet shampooer to clean up, there was still evidence admitted at trial regarding impact blood spatter and cast-off blood stains on the walls and ceiling which could not be explained by a nosebleed.  The forensic report submitted by Petitioner does not challenge the blood spatter found on the sheet in the laundry, and does not conclude the shampooer was incapable of cleaning the bedroom.  (Pet. Ex. 1 at 3.)  Petitioner lived on a ranch with many areas available for the disposal of the contents of the carpet shampooer after it was used to clean up the blood in the bedroom, and her contention that the plumbing and carpet shampooer did not have a sufficient amount of blood to account for the victim's blood loss is without significance.  In any case, such observations were obvious to the jury.  Even assuming the post-conviction forensic report could be characterized as Petitioner claims, that it is more likely than not that the fatal blow was administered somewhere other than the bedroom, the appellate court reasonably concluded that the report in no way calls into question the forensic evidence presented at trial which implicated Petitioner.

/ / /

Petitioner's contention that some of what were reported as blood stains could have been stains caused by rain does not call into question the blood spatter and blood cast-off evidence. She contends that the stain at the foot of the staircase coming down from the balcony off the patio outside the bedroom was actually a water stain that the owner of the property told a detective was there when he rented the ranch to Petitioner.  (Traverse at 24.)  Although Petitioner contends the lack of a bloodstain there would weaken the prosecution's theory that she carried the body down the stairs, the fact that the stain was found five feet up the wall would, if it could be proven not to be blood, merely provide for the more likely possibility that Petitioner dragged the body down the stairs, as it had been dragged from the back of the truck to where it was found.  In any case, DNA was recovered from the stain, and the blood could have been placed over a pre-existing water stain.  Assuming Petitioner is correct that evidence could have been presented that the carpet was wet when examined by the prosecution's expert because of a leak in the window and not due to the use of the carpet shampooer, there was other independent evidence showing the blood stains had been cleaned.  As set forth above, this evidence included the blood found on the bottle of cleaning fluid, and Petitioner's statement to the police that her husband had used the shampooer to clean up after his nosebleed.

Petitioner's contention that the convergence of the blood spatter was below what was calculated by the prosecution's expert witness because the expert did not allow for the effect of gravity, is refuted by the record.  The prosecution's expert considered the effect of gravity when providing his opinion.  (RT vol. 8 at 1316.)  Petitioner has not shown how a slightly different interpretation of the spatter evidence would call into question the veracity of the prosecution's forensic expert's conclusions, how it would have provided for a different scenario regarding the killing which did not implicate her in exactly the same way as the evidence presented at trial implicated her, or how it would have affected the jury's verdict.

Petitioner fails to explain the basis for her claim that further testing is required regarding the area around the potbelly stove to determine whether the stains there are related to the murder. Even assuming the blood stains found in that area could somehow be eliminated from being associated with the murder, it would be relevant only to the opinion of the prosecution expert

regarding the likely sequence of events in the bedroom.  It would not challenge in any way the blood spatter and cast-off evidence showing that the victim was attacked in the bedroom, nor would it challenge the evidence showing the victim was dressed after he was killed and his body dumped where it was found.  To the extent Petitioner contends that because the area around the stove was the only area which had obviously been cleaned by the carpet cleaner, and eliminating it as related to the attack would therefore call into question the implication that she cleaned the room to cover up the attack, it would not call into question the blood spatter evidence showing that the victim was attacked in the room, that she was the only person on the property when the attack occurred, and that she had accurately described the clothes the victim was wearing when found even though he had been dressed after he was killed or incapacitated.  In any case, the evidence showed that the victim bled heavily on the mattress, on the carpet around the stove, and on the track of the sliding door, and therefore the carpet around the stove was the only area where the shampooer was likely needed.

Similarly, Petitioner fails to explain why she contends that blood found on a towel under the mattress next to the large volume bloodstain, which contained DNA other than that of Petitioner, Morales or the victim, and has yet to be associated with anyone, has any relevance to her prosecution.  There could be any number of reasons why a different type of blood would be found on a towel used to clean up blood, particularly in light of Petitioner's other contentions discussed below regarding the nature of the horse business she ran, which she contends was the source of the blood found on the syringe in their bathroom, and her statement to the police that her dog had bled in the bedroom.  Finally, she contends that the act of removing the victim's shirt could have explained the piece of scalp found on the victim's chest.  Once again, there is no indication why the forensic evidence in her case is called into question by this observation.  Assuming she contends this would call into question the implication that the piece of scalp was moved to the chest by the act of someone putting the shirt on the victim after he was attacked, that theory remains a much more reasonable explanation than it being transferred there by the act of removing the shirt.  In any case, it would still not call into question the other evidence showing that the victim was dressed after he was dead or incapacitated.  Such evidence includes

the fact that there were no blood spatter stains found on the clothes the victim was wearing when his body was found, although there were transfer blood stains found on his t-shirt and socks, that there were no mud or splash marks found on the victim's shoes, pants or socks, which would have normally been seen after running on a rainy day, and that the victim's stomach contents were inconsistent with jogging soon after eating a full meal.  (RT vol. 8 at 1171, 1346-56; vol. 9 at 1584.)

Thus, the post-conviction forensic report does not refute in any way the prosecution's theory of the case because it does not call into question any of the evidence showing that the victim was attacked in the bedroom and his body dumped where it was found.  The Court finds that Petitioner's trial counsel obtained an opinion from an expert regarding the blood evidence, the tire marks and the carpeting, and that Petitioner has not overcome the presumption that counsel made a tactical decision not to present forensic evidence at trial.  The Court also finds that the state appellate court's conclusion that Petitioner's post-conviction forensic evidence would not exonerate Petitioner in any way nor point to anyone other than Petitioner as the murderer, and that Petitioner has failed to show a reasonable probability that the result of the trial would have been different if defense counsel would have fully investigated the forensics evidence, is an objectively reasonable application of the Strickland standard.

### 2)  Failure to call Petitioner to testify

Petitioner next contends that her trial counsel made the decision not to have her testify at trial "based on inadequate investigation and incorrect data."  (Pet. Mem. at 9.)  She states that she could have testified that: (a) there were no financial difficulties between her and her husband and no conflict between them based on their finances; (b) they were planning a funeral for Petitioner's mother and it would have been absurd for her to plan a murder at that time; (c) her husband's blood was on the syringe found in the master bathroom because he had assisted her in a veterinary procedure; (d) the victim liked horses and had started a horse-related business; (e) she lied to the Brumbecks about her mother dying to stir their sympathy in order to collect on a debt they owed; (f) Petitioner and the victim were affectionate toward each other and they had no history of domestic violence; (g) the victim had a bad nose bleed in the bedroom which

he cleaned with the carpet shampooer; (h) she told the victim to flip the mattress over after he had his nosebleed; (i) Petitioner and the victim almost always cooked steaks on Saturday night and ate the leftovers on Sunday; (j) the victim often drove the family truck in order to measure jogging distances; (k) Petitioner did not go to the dumpster behind the Vons store, but went into the store and bought toilet paper and soda; and (l) no police officers or police dogs found any blood in the bedroom on Sunday evening or Monday when they were in the house.  (Pet. Mem. at 10-13.)

Petitioner's first contention, that she could have testified regarding her relationship with her husband, would have added little if anything to the evidence already presented on that issue. The jury heard an audiotape of a statement made by Petitioner to a police officer in which Petitioner said her relationship with her husband had been "really pretty good" and had been going "pretty well" after their initial marital difficulties were resolved.  (RT vol. 8 at 1284; CT 345-46.)  Petitioner's statement to the police, which was played for the jury, was lengthy and contained much detail regarding Petitioner's relationship with the victim.  (See id.)  Petitioner has failed to show a reasonable probability that had she testified at trial she would have added any details regarding her and her husband's reconciliation, financial or otherwise, which would have affected the jury's verdict.

Petitioner's contention that she was planning a funeral for her mother and that it would have been absurd for her to plan a murder at that time, is belied by the evidence that the murder was not well planned.  Similarly, her contention that she could have testified that the victim's blood was on the syringe found in the bathroom because he had assisted Petitioner in a veterinary procedure would not challenge the evidence against her in any meaningful way. There were no drugs found in the victim's body other than caffeine, and there was no contention at trial that Petitioner had used the syringe to inject anything into the victim.  (RT vol. 9 at 1585.) Even if Petitioner could have testified that she and the victim engaged in a veterinary procedure which caused the victim to bleed, and that was the explanation for her fingerprint in the victim's blood on the syringe, it still does not explain why the syringe was found in the master bathroom, and would not call into question the blood spatter evidence found in the bedroom.  Petitioner's

07cv1007

1  contention that she could have testified that the victim liked horses and had started a horse-

2  related business would have added little to her statement to the police, heard by the jury,

3  regarding her relationship with the victim.  There is no basis to find that, had Petitioner testified

4  that she lied to the Brumbecks about her mother dying to stir their sympathy in order to collect

5  on a debt they owed her, that any credibility she may have lost due to that evidence would have

6  been rehabilitated in any meaningful way.

7      Petitioner's contention that she could have testified that the victim had a bad nose bleed

8  in the bedroom which he cleaned with the carpet shampooer, and that she told him to flip the

9  mattress after he stained it, would have been duplicative of her son's testimony that Petitioner

10 had explained the presence of blood in the bedroom by saying the victim had a nosebleed.  (RT

11 vol. 10 at 1785.)  A detective also testified that Petitioner had explained the presence of blood

12 in the bedroom by saying that the victim had a nosebleed.  (Id., vol. 8 at 1195.)  In any case,

13 Petitioner's testimony that the blood in the bedroom was from a nosebleed, even if it could

14 explain the large volume blood stain on the underside of the mattress, would have been in stark

15 contrast to the other blood evidence.  This evidence included impact blood spatter on the bed,

16 the wall behind the bed, a window above the bed, the headboard, and on a nightstand, telephone,

17 picture and lamp beside the bed, as well as cast-off blood stains from the weapon on the wall and

18 ceiling.  (Id., vol. 8 at 1196-1204, 1308-1334.)  There was also evidence that the victim bled so

19 much while lying on the track of the sliding door that the blood dripped down into the room

20 directly under the bedroom, and evidence that there was a transfer blood stain was found five

21 feet up the exterior wall adjacent to the stairs leading down from the patio outside the bedroom.

22 (Id., vol. 8 at 1354-56.)  None of this evidence could be explained by a nosebleed.

23     Petitioner contends she could have testified that she and the victim almost always cooked

24 steaks on Saturday night and ate the leftovers on Sunday, and that it would have explained the

25 contents of the victim's stomach.  However, such testimony would not account for the contents

26 of the victim's stomach other than the steak, which included green leafy vegetable matter,

27 potatoes, beans and peppers or tomatoes.  (Id., vol. 9 at 1584.)  There is no indication that had

28 she testified that her husband ate what is essentially a full dinner in the early afternoon

immediately before going jogging it would have had an effect on the jury's verdict, particularly in light of the evidence indicating the victim did not go jogging on Sunday afternoon, but had been killed or incapacitated within two hours of eating dinner on Saturday night and was later dressed in his jogging clothes. In any case, there was testimony that Petitioner told a detective that she could not remember what the victim had eaten on Sunday, but speculated that he probably ate cereal. (Id., vol. 8 at 1286, 1294.)

Petitioner contends she could have testified that the victim often drove the family truck in order to measure jogging distances, which could have accounted for the tire tracks found near his body. However, such testimony would not explain the evidence presented at trial that the tire tracks found near the body showed that Petitioner's truck had backed up to where the body was found, that the grass was bent down as if something had been dragged from the bed of the pickup truck to where the body was found, and that two sets of muddy footprints were found leading from the truck to the body. (Id., vol. 8 at 1174-78; vol. 11 at 2034-43.)

Petitioner contends she could have testified that she did not go to the dumpster behind the Vons store, and that she bought toilet paper and soda at the store. An acquaintance of Petitioner testified at trial that he saw Petitioner driving her pickup truck near a Vons store at about 6:45 p.m. on Sunday, and that it appeared odd that Petitioner turned and headed towards the dumpsters in the back of the store, which was an area not normally used to park to shop at Vons, rather than proceed straight into the Vons parking lot. (Id., vol. 8 at 1429-32; vol. 9 at 1457-58.) Nothing related to the homicide was found in the dumpsters behind the Vons store, but the dumpsters had been emptied on Monday and were not searched until four or five days later. (Id., vol. 13 at 2380-81, 2378.) Petitioner contends that had she testified that she did not go to the dumpsters, but made a purchase at the store, she could have rebutted an implication raised by the prosecution that she had used her pickup truck to dump the body sometime that evening, and had then disposed of evidence in the dumpsters. However, the jury heard her say, during the recorded interview, that she "ran in, picked up something at the store" while she was out looking for her husband that evening. (Id., vol. 8 at 1284; CT 333.) There was also evidence presented in the form of a Vons receipt that Petitioner had purchased something at the store costing $1.01

at 6:58 p.m. on Sunday.  (RT vol. 13 at 2378-79.)  Thus, there is no indication that Petitioner's testimony on this subject would have impacted the jury's verdict.

Finally, Petitioner contends that she could have testified that no police officers or police dogs found any blood in the bedroom when they were in the house on Sunday evening and Monday.  However, evidence at trial showed that the victim was first attacked in the bedroom, a conclusion with which even Petitioner's post-conviction forensics expert agrees, and that there were signs that the bedroom had been cleaned and the evidence of the attack covered up.  The police were in the house on Sunday in response to Petitioner's report of a missing person, and there would have been no basis at that time for them to conduct a thorough examination of the entire house looking for signs of fowl play.  The blood evidence was found when forensic experts examined the house after the police concluded that the victim had been murdered rather than having suffered an accidental death while out jogging, as they had been led to believe by Petitioner.  There is no reasonable probability that evidence of a delay in finding the blood evidence in the bedroom, which was obvious to the jury, and in any case could have been established through the testimony of the investigating officers just as well as through Petitioner's own testimony, would have had any effect on the outcome of the trial.

As quoted above, the appellate court found that Petitioner had failed to explain how the forensic evidence she presented on post-conviction collateral review "would have encouraged her to testify, informed her testimony or how the result at trial could have been different had she done so."  (Lodgment No. 12, In re Dorotik, No. D047784, slip op at 2-3.)  That determination is not an unreasonable application of Strickland because Petitioner has not demonstrated that her proffered testimony would have had any effect on the jury's verdict.

**3) Petitioner's physical ability**

Petitioner contends defense counsel was deficient for failing to demonstrate that she was physically incapable of committing the murder as theorized by the prosecution.  (Pet. Mem. at 13-14.)  Specifically, she contends that she has a well-documented fractured hip repaired with metal pins, and a severely arthritic back.  (Id.)  She contends trial counsel could have retained an expert witness to establish that she lacked the physical strength necessary to carry a body

across a 60 foot porch, down a flight of stairs, load it into a truck and dump it, all without leaving a trace of evidence on the porch or on her clothes.  (Id. at 14, 21-22.)

Respondent contends that evidence at trial established that Petitioner was physically able to move the body, in that both of Petitioner's sons testified that she was capable of hard ranch work, that they had seen her moving heavy irrigation pipes weighing fifty to seventy-five pounds, that she participated in feeding horses which required heavy lifting, and that she was skilled at hammering, which was consistent with the method of attack on the victim.  (Ans. Mem. at 20.)  Respondent also contends that defense counsel employed a physician to examine Petitioner's medical condition prior to trial, and Petitioner has not overcome the presumption that trial counsel made a tactical decision not to introduce such evidence.  (Id.)

As set forth above, the Court will conduct an independent review of the record with respect to this and the remaining aspects of claim one.  The record reflects that Petitioner's trial counsel did consult an expert witness prior to trial regarding Petitioner's physical ability to move the victim's body.  Defense counsel retained Dr. William Curran to examine Petitioner on May 2, 2001, well before trial began on May 15, 2001, and provided Dr. Curran with Petitioner's medical records regarding her past injuries and surgeries.  (RT vol. 1, May 1, 2001 at 9-11.)  Petitioner's trial counsel informed the court that he would not decide whether to call Dr. Curran as a trial witness until after the examination.  (Id.)  Two days later, on May 3, 2001, Petitioner's trial counsel informed the court that he had heard from Dr. Curran, that his co-counsel had "spent a considerable amount of time with him on the phone," and that trial counsel had "taken that information and discussed it with my client this morning."  (RT vol. 3, May 3, 2001 at 324.)  Thus, Petitioner's contention that trial counsel was deficient because he failed to obtain an expert opinion as to her physical abilities is without merit.

Even to the extent Petitioner could demonstrate deficient performance in this regard, she is unable to demonstrate prejudice.  Petitioner's son Alexander testified that Petitioner's hip had been shattered in an automobile accident in 1983 or 1984, but that in 1993 or 1994, he observed her moving 20 or 40-foot long irrigation pipes which were made of metal, and that she moved "a lot of relatively heavy things" in connection to the horse ranch.  (RT vol. 10 at 1789.)

Petitioner's son Nicholas testified that after Petitioner recovered from her automobile accident, she was doing work around the ranch "that was pretty strenuous and pretty physical," including moving heavy irrigation pipes which were about 50 feet long and weighed between 50 and 75 pounds. (Id. at 1819-20, 1836.) Testimony at trial indicated that the victim weighed 147 pounds at the time of his death, and that a slide of some type was used to move the body from the bed of the pickup truck through the grass to where it was found. (Id., vol. 8 at 1174-75; vol. 9 at 1571.) In addition, a transfer blood stain was found about five feet up the exterior wall adjacent to the stairs leading down from the patio off the bedroom. (Id., vol. 8 at 1354-56.) As discussed below with respect to claim two, there was also evidence that more than one person was involved in moving the body.

Based on an independent review of the record, the Court concludes that Petitioner has not shown that defense counsel failed to consult an expert regarding her physical abilities, and has not shown the expert retained by trial counsel would have testified that she was physically incapable of moving her husband's body. Even assuming an expert could have provided such an opinion, there is no reasonable probability that the jury would have deferred to the expert's opinion over the evidence presented at trial, including the testimony of eyewitnesses regarding her actual physical abilities.

**4)  DNA testing**

Petitioner next contends counsel failed to object or move for a mistrial when Detective Empson testified that he did not bother to obtain DNA testing of the rope used to strangle the victim, or the victim's shoelaces, because he had already decided that Petitioner was the murderer. (Pet. Mem. at 14.) She also contends that defense counsel failed to use DNA and/or other testing methods on the rope, fingernail scrapings from the victim, fingerprints on the truck, blood on a towel found in the bedroom which was determined to belong to someone other than Petitioner or the victim, fingernail scrapings of farm workers Morales and Armando, black flecks of material found in the victim's scalp, and the area in and around the potbelly stove. (Id. at 14-15.)

/ / /

-23-

1    Respondent contends that although the question to Empson at issue, and his answer,

2  appears to be improper, they only served to enhance the point the defense was trying to make

3  that a sloppy investigation had been conducted by the police, and therefore no prejudice is

4  shown.  (Ans. Mem. at 20-21.)  Respondent also contends no prejudice is shown by trial

5  counsel's failure to test the rope, towel, fingernail scrapings and the other items because

6  Petitioner has not stated what the additional testing would have disclosed.  (Id. at 21.)

7    The relevant questions and answers to Detective Richard Empson by defense counsel on

8  cross-examination are as follows:

9
   Q.    How about the rope that was found on the body?  You are led to believe the rope was
10         probably used for strangulation purposes; correct?

11  A.    Yes.

12  Q.    Was there any attempt or did you direct anyone to do any DNA testing looking for any
         DNA on the rope?
13
   A.    No, I did not, and I had asked the criminalists about that and whether or not I should
14         submit a request on that.

15  Q.    Who specifically did you ask?

16  A.    I asked Carolyn Gannett, and I asked Steve Guruff (phonetic), who's the supervisor in
         charge of the DNA at the sheriff's lab.
17
                                    * * *
18  Q.    And did both of them indicate to you there's likely to be cells in and about the area where
         the rope was pulled, epidural cells?
19
   A.    Actually, they had told me that there could be a multitude of DNA in there from the time
20         that the rope was manufactured until the rope ended up in the location were it was found.

21  Q.    And then you're well aware both the prosecution and myself had matters sent out for
         DNA testing to an outside lab; correct?
22
   A.    Yes
23
   Q.    Did you ever speak to that doctor as to DNA testing of the rope?
24
   A.    No, I did not.
25

26  (RT vol. 8 at 1245-46.)

27    On redirect examination, the prosecutor asked Detective Empson about his answers to

28  defense counsel's inquiry, and after objections by both parties, Empson testified that the defense

-24-

07cv1007

had been given access to the rope for DNA testing but did not conduct such testing.  (Id. at 1265-67.)  The following exchange then occurred between defense counsel and Empson on re-cross examination:

Q.      Okay.  And the rope, if somebody is pulling like hell on a rope trying to kill somebody, they told you you're probably not going to get any skin cells on that rope; is that what they said to you?

A.      I don't recall what was said specifically about the rope, but there was – I do recall one conversation about the rope, and this was Steve Guroff that had mentioned there was no way of determining who handled the rope from the time the rope was manufactured until the time the rope was found around the neck of Mr. Dorotik.  And the recommendation was that it not be submitted for DNA analysis.

Q.      Is it –

A.      So that a number of people could have handled that rope after the time it was manufactured.

Q.      As the lead detective, do you think maybe that the last person who handled that rope before it was taken into evidence might have been the killer?

Prosecutor:    Objection:  You Honor, this calls for speculation; lack of foundation, and it is somewhat argumentative.

The Court:    Overruled.

A.      Yes, good likelihood.

Q.      And then if you were to recover DNA on that rope from Claire Dorotik or from Leonel Morales, might give you better insight as to who actually killed Bob Dorotik, don't you think?

A.      I believe I know who killed Mr. Dorotik.

Q.      Believe you know?

A.      Yes.

Q.      From the evidence that was presented before this jury, you believe you know it; correct?

A.      Yes.  That's why I arrested Jane Dorotik.

Q.      Thank you, sir.  Nothing else.

(Id., vol. 12 at 2189-91.)

Petitioner has failed to demonstrate that she received constitutionally ineffective assistance of counsel based on defense counsel's failure to request a mistrial due to Detective Empson's answer that he arrested Petitioner because he personally believed, based on the

evidence presented to the jury, that Petitioner was the killer. Although it was improper for the detective to give his personal opinion regarding Petitioner's guilt, it is clear that defense counsel was attempting to demonstrate that the police investigation was sloppy or incomplete because the lead detective had made up his mind who the killer was and had then ignored or failed to follow up on evidence which might have pointed to a suspect other than Petitioner. Petitioner has therefore failed to overcome the presumption that defense counsel had a tactical reason for getting the detective to admit he did not pursue DNA testing on the rope because he had already decided Petitioner was guilty. In any case, Petitioner has not shown a reasonable probability that a defense motion for a mistrial would have been granted had one been requested. Neither has she shown any prejudice from the detective's answer. There is no reasonable probability that the jury's verdict was affected by hearing that the lead detective in a murder investigation believed that the person he had arrested for the murder was guilty. On the other hand, this was primarily a circumstantial case against Petitioner based on the forensic evidence, and hearing that the lead detective did not believe testing of one of the murder weapons was necessary because he had already decided who the killer was, was beneficial to the defense case.

Petitioner argues in the Traverse that she was prejudiced by the failure to test the rope because it was one of the two murder weapons, the only one recovered, and if there was DNA found on the rope it could have been run through a national DNA database, and if it matched a known felon, she might have been exonerated and the real killer might have been identified and prevented from killing again. (Traverse at 9-11.) She contends the only reason why the rope was not tested was due to her inability to afford the cost of the testing, resulting in a denial of her Fifth and Fourteenth Amendment rights to due process and equal protection. (Id. at 11-12.) This claim was not presented in the Petition, and is presented in the Traverse in direct violation of this Court's Order directing a response to the Petition, wherein Petitioner was instructed that: "Any traverse by Petitioner (a) shall state whether Petitioner admits or denies each allegation of fact contained in the answer; (b) shall be limited to facts or arguments responsive to matters raised in the answer; and (c) shall not raise new grounds for relief that were not asserted in the Petition." (See 7/9/07 Order [Doc. No. 7] at 3.) The claim is therefore not properly before the

Court.  See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) (court may ignore issue raised for first time in traverse when scope of traverse has been specifically limited by court order and petitioner ignores order to file a separate pleading indicating intent to raise claim).  In any case, Petitioner's claim in this regard is based purely on speculation.  Speculative and conclusory allegations are insufficient to prove that counsel provided ineffective assistance. James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994); Blackledge v. Allison, 431 U.S. 63, 74 (1977); see also Simmons v. Gramley, 915 F.2d 1128, 1134 (7th Cir. 1990) ("cursory allegations that are purely speculative cannot support a claim of lack of competence of counsel.").[1]

The claims regarding other areas where Petitioner contends testing should have been conducted are similarly unavailing.  Detective Empson testified that although the victim's shoes had apparently been tied by someone other than the victim, most likely the killer, he was told by the criminalists that DNA testing would not be helpful because there was no blood found on the shoelaces.  (RT vol. 12 at 2187.)  Petitioner has not shown that testing of the shoelaces would

---

[1] Petitioner argued to the state supreme court that the forensic tests had not been conducted because she could not afford them, but did not present the claim as a violation of the Fifth and Fourteenth Amendments as she has in the Traverse.  (Lodgment No. 13 at 31.)  To the extent this aspect of claim one was not properly presented to the state supreme court, the exhaustion requirement would nevertheless be satisfied, "if it is clear that (the habeas petitioner's) claims are now procedurally barred under (state) law."  Gray v. Netherland, 518 U.S. 152, 161 (1996), quoting Castille v. Peoples, 489 U.S. 346, 351 (1989); Engle v. Isaac, 456 U.S. 107, 125-26 n.28 (1982) (noting that the exhaustion requirement applies "only to remedies still available at the time of the federal petition."); Valerio v. Crawford, 306 F.3d 742, 770 (9th Cir. 2002) (same), citing Phillips v. Woodford, 267 F.3d 966, 974 (9th Cir. 2001) ("the district court correctly concluded that [the] claims were nonetheless exhausted because 'a return to state court for exhaustion would be futile.'").  "A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him."  Cassett v. Stewart, 406 F.3d 614, 621 n.5 (9th Cir. 2005) (quoting Coleman v. Thompson, 501 U.S. 722, 732 (1991)).  It appears clear that Petitioner has satisfied the technical requirements of exhaustion with respect to any aspect of claim one not presented to the state courts because she no longer has state court remedies available.  Any attempt by Petitioner to return to state court at this time in order to seek further post-conviction relief would likely meet with the imposition of a procedural bar.  See In re Robbins, 18 Cal.4th 770, 788 n.9 (1998) (In re Clark "serves to notify habeas corpus litigants that we shall apply the successiveness rule when we are faced with a petitioner whose prior petition was filed after the date of finality of Clark."), see also In re Clark, 5 Cal.4th 750, 797-98 (1993) ("the general rule is still that, absent justification for the failure to present all known claims in a single, timely petition for writ of habeas corpus, successive and/or untimely petitions will be summarily denied," and describing the "fundamental miscarriage of justice" exception to that rule).  Moreover, as discussed above, this aspect of claim one is without merit, and the exhaustion requirement is generally inapplicable to such claims.  See Acosta-Huerta v. Estelle, 7 F.3d 139, 142 (9th Cir. 1982) (finding that the exhaustion requirement is inapplicable as to claims which "clearly do not rise to the level of alleged deprivations of constitutional rights.")

have revealed any DNA.  Even assuming DNA could have been found on the victim's shoelaces, Petitioner has failed to overcome the presumption that trial counsel made a tactical decision not to seek DNA testing.  In light of the fact that the evidence showed that the victim was attacked in the bedroom he shared with Petitioner at a time when only Petitioner and the victim were home, and then dressed in his jogging clothes by someone else and had his shoes tied by someone else, and in light of the fact that Petitioner described to the police the clothes the victim was wearing when found and said that she had last seen the victim dressed in those clothes ready to go jogging on Sunday afternoon, it was reasonable for trial counsel to assume that if DNA other than the victim's could be found on the shoelaces, it likely would have belonged to Petitioner, which would have been harmful to the defense.  Even if DNA belonging to someone other than Petitioner or the victim was found on the shoelaces, as discussed more thoroughly below with respect to claim two, it would at best point to an accomplice, but would not in any way call into question the evidence implicating Petitioner in the initial attack.

Petitioner contends that defense counsel was deficient for failing to test the black flecks of material found in the victim's scalp, which could have revealed that they were paint from a car indicating that the victim was hit by a car while jogging, or at least call into question the conclusion of the prosecution's expert that the victim was hit with a hammer, because hammer heads are never painted.  (Traverse at 23.)  However, the prosecution expert admitted that it was not conclusive that the blows to the victim's head were struck by a hammer, and said they could have been struck by something with a similarly high mass, such as a crowbar.  (RT vol. 11 at 1894, 1913.)  Petitioner merely speculates that testing of the black flakes found in the victim's skull might have revealed that the victim was hit by a car.  In light of the nearly conclusive evidence that the victim was not struck by a car, there is no reasonable probability that the jury verdict would have been affected by further testing of the black flakes, which might in any case have been found to be from a crowbar, or perhaps from an object found in Petitioner's home.

Petitioner's contention that counsel was deficient for failing to identify the footprints where the body was found is without merit.  The police compared the footprints to shoes seized from Petitioner's home, and from shoes worn by search workers and police on the scene, and

could not match them, partly because of the lack of detail in the impressions.  (Id., vol. 11 at 2048-50.)  Petitioner appears to contend that defense counsel was deficient for not doing what the police expert was unable to do.  In any case, as discussed in detail with respect to claim two, this evidence could have at most supported a theory that someone else was involved in dumping the body, but would have had no effect on the evidence that the victim's blood had been spattered all over the bedroom and had been cleaned up at a time when Petitioner was the only person on the property.  Petitioner has failed to demonstrate how it would have been helpful to the defense case, other than pure speculation regarding possible results, to conduct testing of the fingernail scrapings from the victim, fingerprints on the truck, blood on a towel found under the mattress in the bedroom, fingernail scrapings of farm workers Morales and Armando, and the area around the potbelly stove.  Even if DNA could have been recovered it would, as discussed below with respect to claim two, at best point to an accomplice.  It would not challenge the evidence indicating that Petitioner attacked the victim in the bedroom, and would not explain how she was able to describe the clothing the victim was found in despite the evidence establishing that he was dressed after he was killed.  Accordingly, based on an independent review of the record with respect to this aspect of claim one, the Court finds that the silent denial by the state supreme court was neither contrary to, nor involved an unreasonable application of, Strickland.

**5) Alternate scenarios**

Petitioner contends defense counsel was deficient for failing to present the jury with alternate scenarios consistent with the physical evidence.  (Pet. Mem. at 2.)  She contends the theory that the victim was attacked between 1:00 p.m. and 4:00 p.m. on Sunday and killed shortly thereafter, is far more consistent with the level of rigor mortis present when the body was discovered than the Saturday night killing scenario advanced by the prosecution.  (Id. at 20-21; Traverse at 13-14.)  She opines that her farm worker Morales could have come to the house Sunday afternoon when the victim was preparing to go jogging and while Petitioner was in the horse barn, became unhappy that he did not receive his usual Sunday pay since he owed the victim money and had agreed to take no or reduced pay until the debt had been paid, and,

knowing the victim kept cash in the house, killed him.  (Id. at 28.)  She also contends it was well known that she kept the keys in her pickup truck and that Morales could drive it whenever he needed it for ranch work.  (Traverse at 24-25.)

The medical examiner testified that the body was found at 4:30 a.m. Monday morning, that he did not examine the body until about twelve hours later, and that due to the many unknown variables he could not establish a time of death.  (RT vol. 9 at 1589-90.)  He testified that the victim died within two hours of his last meal, that rigor mortis was fully developed when he examined the body, and that typically rigor mortis takes eight to twelve hours to fully develop and will stay fully developed for another eight to twelve hours.  (Id. at 1564-67, 1584.)  Thus, although Petitioner is correct that the medical findings regarding rigor mortis support a time of death between 1:00 p.m. and 4:00 p.m. on Sunday afternoon, they can just as easily be used to support a time of death twelve hours earlier on Saturday night.  In any case, they by no means conclusively support Petitioner's suggested time of death, and are not, as Petitioner contends, far more consistent with a Sunday afternoon time of death than with a death occurring shortly after an attack on Saturday night.

As to the scenario that a farm worker named Morales killed the victim, defense counsel presented evidence in that regard.  Lisa Marie Singh testified for the defense that the school bus drops her daughter off near where the body was found, and that she picks up her daughter there every day after school.  (Id., vol. 13 at 2313-14.)  On four occasions while waiting to pick up her daughter she saw a scraggly-looking man, who may have been Hispanic, sitting in a black pickup truck parked in that area, which concerned her because it was a school bus stop and because the man was usually drinking beer.  (Id. at 2315-17, 2330-31.)  She testified that she drove by that area about 4:00 p.m. or 5:00 p.m. on Sunday, and that the same black pickup truck with the same man in the driver's seat was parked there, which was unusual because she had previously only seen him there on weekdays, and that the man whose body was found there the next morning was in the cab of the pickup truck, slumped over, sitting between the driver and a passenger.  (Id. at 2318-19.)  The tires from a black Chevy S-10 pickup truck owned by Leonel Morales, a farm hand who worked part-time at Petitioner's ranch, were compared to the tire

marks found near the body, as were the tires from Petitioner's Ford F-250 pickup truck.  (Id., vol 11, 2044-46.)  The tire marks near the body were consistent with having been made by three of the tires on Petitioner's truck, all three of which lined up consistently with the width of the tires on Petitioner's truck, and one tire mark at the scene may have been made from one of the tires on Morales' truck.  (Id. at 2046-47.)  Defense counsel argued to the jury that Singh had not seen that truck at the bus stop or anywhere else since it had been impounded by the police several days after the murder.  (Id., vol. 13 at 2499.)  Defense counsel also cross-examined the prosecution's expert on the victim's head wounds, who admitted that the wounds could have been made with a drywall hammer, and defense counsel noted that Morales worked with drywall.  (Id., vol. 11 at 1912.)

Thus, defense counsel presented evidence that Morales was seen where the body was found on Sunday afternoon, a time when the medical examiner could not rule out the time of death, in the company of the victim, who was slumped over in his seat.  A tire mark which may have been made by Morales' truck was found where the body was dumped, and the theory that Morales took the victim from the house was consistent with Petitioner's statement to the police, heard by the jury, that she was in the horse barn on Sunday when Morales could have entered the house, attacked the victim, and dumped his body where it was found.  As discussed below with respect to claim two, other evidence pointed to more than one person being involved in dumping the body, and defense counsel attempted to implicate not only Morales, but also Petitioner's daughter Claire, who allegedly came in from out of town Sunday evening in time to participate in dumping the body.  Both Claire and Morales invoked their Fifth Amendment privilege and did not testify at Petitioner's trial.  Obviously the jury rejected the defense theory that Morales or Claire murdered the victim.  However, Petitioner's contention that defense counsel was deficient for failing to present such a scenario to the jury for their consideration is not supported by the record.

Accordingly, based on an independent review of the record with respect to this aspect of claim one, the Court finds that the silent denial by the state supreme court was neither contrary to, nor involved an unreasonable application of, Strickland.

**6) Innocent explanations**

Petitioner contends counsel was deficient for failing to provide innocent explanations for the apparently incriminating evidence presented by the prosecution.   (Pet. Mem. at 2.) Specifically, she contends: (a) the blood found on the mattress could have come from a nosebleed; (b) the tire tracks found near the victim's body could have been made when the victim measured the distance for his jog, as was his custom: (c) the victim's blood found on the truck was minute and could have been deposited in the course of his work on the ranch; (d) the victim's body and his jogging jacket were found along his usual jogging route, and two witnesses saw him out late Sunday afternoon in the area where the body was found on Monday morning; (e) her fingerprint in the victim's blood on the syringe found in the bathroom could have resulted from the victim assisting Petitioner with a medical procedure on a horse, which could have been verified by medical records and syringes kept in the house and barn in connection to the horse business; (f) there was nothing found in the dumpsters behind the Vons store, and the testimony that Petitioner was seen driving in the direction of the dumpsters was consistent with her shopping at the store; and (g) the type of rope used to strangle the victim was commonly found in the Dorotik household, and Petitioner was knitting a dog bed with the rope. (Id. at 20-26.)

Petitioner has not shown deficient performance by defense counsel in any of these areas. As set forth above, evidence of a nosebleed was presented at trial, through Petitioner's statement to the police that the victim had a nosebleed, and through testimony from her son that she had told him that the bloodstains on the mattress were caused by a nosebleed.  The fact that the victim had a custom and practice of driving the truck to measure the distance along his jogging route would not have explained why the truck was backed up into the area where the body was found and why the grass was matted down indicating the body was dragged on a sled from the end of the tire tracks to where it was found.  The fact that the victim's body and his jogging jacket were found along his usual jogging route, and two witnesses claimed to have seen him jogging late Sunday afternoon in the area where the body was found, does not provide an innocent explanation for what happened to the victim.  As set forth above, the jury heard the

testimony that the victim's shoes were tied by someone other than the victim, and that there were no impact spatter stains on the clothes the victim was found wearing, although there were transfer blood stains as if the clothes were placed on his body after he was killed.  The jury also heard that there were no mud or splash marks found on the victim's shoes, pants or socks, which would have normally been seen after running on a rainy day, a further indication that he was dressed in his jogging outfit after he was killed.  (RT vol 8 at 1171.)  In addition, the victim's stomach contents were inconsistent with jogging soon after eating a full meal.

In addition to the evidence showing that Petitioner had not been jogging prior to his death, the owner of the property on which the body was found testified that he and his son were planting trees on the property from about 3:00 p.m. until about 5:00 p.m. on Sunday, that they would have seen the body if it had been there, and that he was "absolutely" sure the body was not there when they left.  (Id., vol. 9 at 1613-19.)  As set forth above, defense counsel presented the testimony of Lisa Marie Singh, who said she saw the victim in the company of two men in a black pickup truck on Sunday afternoon near where his body was found, which provided an explanation as to why the body was found in that area which did not implicate Petitioner.  As discussed in claim two below, defense counsel sought to re-open testimony during jury deliberations based on information received from an eyewitness named Sherry Newton, who did not contact the defense until after closing arguments but said she had given a statement to the police within a week of the murder which was never disclosed to the prosecution.  As set forth below, Newton testified at the new trial motion that on Sunday afternoon she saw a man jogging in the area where the body was found, but the jogger she saw was over six feet, three-inches tall and weighed about 240 pounds, whereas the victim was five-feet, eight and one-half inches tall and weighed 147 pounds.  As set forth in connection to claim two, Newton testified that the man she saw jogging was wearing different clothes than those found on the victim, that the truck she saw had a black and gold license plate whereas Morales' truck was registered 14 years after the DMV stopped issuing black and gold license plates, and she described the weather that day as warm and sunny whereas everyone else described it as cold and rainy.  Also as discussed below with respect to claim two, the police received reports of other people jogging in that area, and

-33-

the witnesses Petitioner contends saw the victim jogging obviously saw someone other than the victim, and/or could not be sure what day they saw the jogger they reported.

Thus, defense counsel was not deficient for failing to present an innocent explanation consistent with the victim being killed while jogging.  Rather, that theory was presented to the jury and was rejected because it was simply inconsistent with the evidence that the victim was killed or incapacitated in the bedroom at a time when Petitioner was the only person on the property other than the victim, and was inconsistent with the evidence pointing to Petitioner dumping the body sometime Sunday evening.  Moreover, as discussed below with respect to claim two, defense counsel vigorously pursued a motion to reopen the defense case while the jury was deliberating, which he brought as soon as he learned of Newton's statement.  However, Newton was found lacking in credibility as to her contention that she gave a statement to the police at or near the time of the murder, it appeared that she saw someone other than the victim jogging, and the black truck she saw did not belong to Morales.  Even assuming counsel was deficient in failing to call Newton as a trial witness, there is no reasonable probability that her testimony would have had an effect on the jury's verdict.

With respect to the syringe found in the master bathroom with Petitioner's fingerprint in the victim's blood, the fact that such syringes are commonly found and used on the property, and that the victim assisted in a procedure during which he was injured and bled, does not provide an innocent explanation why the syringe would be found in the bathroom.  The fact that the police did not find anything related to the homicide in the dumpsters behind the Vons store is explained by the fact that the dumpsters had been emptied on Monday and were not searched until four or five days after Petitioner was seen driving toward them on Sunday evening.  (Id., vol. 13 at 2380-81, 2378.)  As set forth above, the jury heard evidence, in the form of Petitioner's statement to the police, her statement to her son, and the receipt from the store, that she was at the store to purchase something.  As to her contention that the type of rope used to strangle the victim was commonly found in the Dorotik household, and that she was knitting a dog bed with the rope, this does not provide an innocent explanation for why that same type of rope was used to strangle her husband.  Rather, if anything, such evidence would have provided

-34-

evidence of opportunity, particularly in light of the fact that the murder appeared to be poorly planned.  Finally, even assuming it was deficient performance not to present evidence that the minute amount of the victim's blood found on the truck may have come from his work on the ranch, there is no reasonable probability that such an obvious point would have impacted the jury's verdict.  Other evidence tied the truck to the dumping of the body, including the tire marks found by the body.  In any case, the jury heard, though the recorded statement of Petitioner, that the victim drove the truck in connection to his business of making and delivering horse jumping equipment.  (Id., vol. 8 at 1284; CT 342, 389.)

Accordingly, based on an independent review of the record with respect to this aspect of claim one, the Court finds that the silent denial by the state supreme court was neither contrary to, nor involved an unreasonable application of, Strickland.

**7) Police investigation**

Petitioner contends that counsel was deficient for failing to present evidence that the police focused on Petitioner from the beginning of the investigation and failed to follow other leads which would have led them to the real killers.  (Pet. Mem. at 2.)  Specifically, she states that: (a) Detective Empson admitted in court that he did not order testing of the rope or shoelaces because he had already concluded that Petitioner was guilty; (b) Lisa Marie Singh told Detective Ryzdynski that she saw the victim in a black truck with two males a few feet from where the body was found, but that Singh was not contacted by the Sheriff's Department until fifteen months later and told at that time that she had been mistaken because Petitioner was the killer; and (c) the jury was not permitted to hear that Sherry Newton saw the victim jogging about an hour before Singh saw him, and that Newton reported seeing a black truck in the vicinity being driven by two males.  (Id. at 16-17.)

As set forth above, the jury was presented with the testimony of Detective Empson regarding his decision not to conduct DNA testing on the rope and shoelaces, and his comment that he had already decided Petitioner was guilty.  Thus, this evidence was presented by defense counsel and, for the reasons discussed above, there is no basis for a finding of deficient performance or prejudice.  Petitioner's allegation that Lisa Marie Singh was not contacted by

the detectives until fifteen months after the murder, and that she was told she was wrong about seeing the victim, does not provide a basis for a finding of deficient performance or prejudice. Rather, the recorded statement given by Petitioner and heard by the jury included a summary of Singh's statement.  The detective, in explaining why Petitioner was being asked about anyone who might own a black pickup truck, was heard by the jury telling Petitioner that a woman said she had seen a small black truck in the area where the body was found, that she had become worried when the press began asking her questions, and that she had told the press everything she told the police.  (Id., vol. 8 at 1284; CT 374.)  Petitioner attaches a copy of a newspaper story published the day after the body was found reporting that the police planned to question a witness who had told them that she saw the victim in a truck with two men in the area Sunday between 5:00 p.m. and 7:30 p.m.  (Traverse, Ex. 1.)  Singh actually testified at trial, and Petitioner has come forward with no evidence that the prosecution or the police made any attempt to dissuade her from testifying.  Even assuming Petitioner could show that the police told Singh they thought she was mistaken and that Petitioner was the killer, in light of the fact that Singh testified at trial consistently with her statement she gave to the police the day after the body was found, and in light of the fact that the jury heard that Detective Empson had failed to conduct further testing based on his belief that Petitioner was the killer, Petitioner has not shown that there would have been any effect on the jury's verdict had they heard that Singh was told by the police that she was mistaken or that her testimony was unnecessary since they knew who the killer was.  In any case, as discussed below with respect to claim two, Singh's testimony had no impact on the evidence implicating Petitioner in the attack on the victim, and could not explain how Petitioner knew what the victim was wearing when his body was found.

Petitioner contends defense counsel was deficient because the jury was not permitted to hear that Sherry Newton saw the victim jogging about an hour before Singh saw him, and that Newton reported seeing a black truck in the vicinity being driven by two males.  In support of the new trial motion, defense counsel indicated that Newton was a witness who could not have been discovered with reasonable diligence because Newton did not contact defense counsel until after closing arguments had been presented.  (Pet. Ex. 10 at 5-6.)  Counsel also stated that

Newton had given a statement to the police within one week of the murder, and the failure to disclose the statement was a violation of their duty to disclose under Brady. (Id. at 6.) As discussed below with respect to claim two, there was no credible evidence that Newton gave a statement to the police at or near the time the body was discovered. She testified at the new trial motion that the man she saw jogging was wearing different clothes than those found on the victim, that the truck she saw had a black and gold license plate, whereas Morales' truck was registered 14 years after the DMV stopped issuing black and gold license plates, and she described the jogger she saw as between six-feet, three-inches and six-feet, five-inches tall, weighing between 220 and 240 pounds, whereas evidence at trial indicated the victim was five-feet, eight and one-half inches tall, and weighed 147 pounds. As discussed in detail below with respect to claim two, Newton's testimony would at best support the defense theory that someone assisted Petitioner in disposing of the body and was cumulative to evidence presented at trial on that subject, but would in no way call into question Petitioner's involvement in the killing and the cleaning of the bedroom.

Accordingly, based on an independent review of the record with respect to this aspect of claim one, the Court finds that the silent denial by the state supreme court was neither contrary to, nor involved an unreasonable application of, Strickland.

**8) Pre-trial investigation**

Petitioner contends that her trial counsel should have engaged in a reasonably competent pre-trial investigation before pursuing the absurd theory that her daughter Claire murdered the victim. (Pet. Mem. at 1.) She contends that defense counsel was responsible for her conviction because he implied that she covered up evidence of the killing in order to protect her daughter from being convicted of murder. (Traverse at 18.) Respondent contends that defense counsel may have had no other tactical choice but to implicate Claire, and that such tactical choices should not be criticized on the basis of hindsight. (Ans. Mem. at 19.)

As detailed above, defense counsel introduced evidence that farm worker Morales was implicated in the murder. Tire tracks found near the body matched a tire on Morales' truck, and footprints near the body indicated that two people may have participated in dumping the body.

Both Morales and Claire, the two most likely suspects in helping Petitioner dump the body, invoked their Fifth Amendment privilege and did not testify at Petitioner's trial. However, the evidence of someone else's involvement in dumping the body did not exonerate Petitioner from the actual killing. Rather, the evidence showed that Petitioner was the only person on the property when the victim was attacked in the bedroom they shared, that she described for the police the exact clothes the victim was found wearing and said he had been wearing those clothes when he went out jogging, even though it was established that someone else had dressed the victim after he was dead, and that he most likely was attacked Saturday night within two hours of his last meal. Thus, defense counsel was in a difficult position attempting to explain evidence which suggested that more than one person participated in dumping the body while at the same time trying to present an alternate explanation as to how Petitioner was not aware that the victim had been attacked in the bedroom they shared, and was not aware that significant cleaning activities had taken place in the bedroom without her knowledge.

Defense counsel attempted to raise a reasonable doubt regarding Petitioner's participation by presenting evidence that Morales was capable of killing the victim and cleaning the bedroom while Petitioner was in the barn, and then dumping the body. As discussed below with respect to claim two, where Petitioner contends the delay in discovering Singh as a witness prevented her from discovering other witnesses who reported seeing joggers and black trucks in the area where the body was found, the additional witnesses would not have provided material evidence supporting a theory that the victim was killed while jogging, because the blood evidence in the bedroom was too strong, and no reasonable inference could be raised that the victim was attacked anywhere but the bedroom. Petitioner has not shown that defense counsel could have presented a stronger case for third party involvement of someone other than Morales or Claire if he had conducted a more thorough pre-trial investigation. Even assuming Petitioner could show that defense counsel's pre-trial investigation was deficient because it led to the failure to call additional witnesses who saw joggers and the black truck in the vicinity of where the body was found, for the reasons discussed below with respect to claim two, she has not shown that she was prejudiced by such a deficient pre-trial investigation.

1 Accordingly, based on an independent review of the record with respect to this aspect of

2 claim one, the Court finds that the silent denial by the state supreme court was neither contrary

3 to, nor involved an unreasonable application of, <u>Strickland</u>.

4 **9) Counsel's statements**

5 Petitioner contends trial counsel made promises to the jury in his opening statement

6 regarding evidence they would see which he did not keep, that counsel admitted that he did not

7 believe in the evidence presented at trial, and that he told the jury during closing argument that

8 Petitioner was guilty. (Pet. Mem. at 13; Traverse at 7-8.) Respondent acknowledges that trial

9 counsel predicted the evidence would establish that the victim did not like women, that he had

10 a difficult relationship with his daughter Claire, and that Claire was not in Long Beach over the

11 weekend the murder took place as she had contended, all in an effort to suggest Claire was the

12 killer. (Ans. Mem. at 19.) Respondent argues that evidence supporting the theory that Claire

13 was the killer was not presented at trial as promised because it was not true, but that in any case

14 the jury was instructed to base their verdict on the evidence presented and not on the statements

15 of counsel. (<u>Id.</u> at 20.)

16 The jury was in fact instructed that they "must base your decision on the facts and the

17 law," that "if anything concerning the law said by the attorneys in their arguments or at any other

18 time during the trial conflicts with my instruction on the law, you must follow my instructions,"

19 and that "statements made by the attorneys during the trial are not evidence." (CT 272, 274.)

20 "The Court presumes that jurors, conscious of the gravity of their task, attend closely the

21 particular language of the trial court's instructions in a criminal case and strive to understand,

22 make sense of, and follow the instructions given them." <u>Francis v. Franklin</u>, 471 U.S. 307, 324

23 n.9 (1985). However, "there are some contexts in which the risk that the jury will not, or cannot,

24 follow instructions is so great, and the consequences of failure so vital to the defendant, that the

25 practical and human limitations of the jury system cannot be ignored." <u>Bruton v. United States</u>,

26 391 U.S. 123, 135 (1969) (finding such a situation where jury was instructed to ignore

27 powerfully incriminating extrajudicial statements of a co-defendant which were devastating to

28 the defense, and where the inherently unreliable nature of that evidence was intolerably

1   compounded by the failure of the co-defendant to be subject to cross-examination).  Petitioner

2   has not established that the jury did not follow the instruction to base their verdict on the law and

3   evidence, or follow their instruction that the statements of counsel are not evidence.

4   Because defense counsel presented a plausible defense that someone other than Petitioner

5   murdered the victim, namely Morales, the fact that counsel's opening statement prediction that

6   the evidence would point to Claire did not materialize, provides no basis for a finding of

7   deficient performance or prejudice.  Petitioner argues that it would have been better if counsel

8   had simply challenged the prosecution's circumstantial evidence rather than utilizing a strategy

9   which was not supported by the evidence and which implied that Petitioner might be covering

10  up for her daughter.  (Traverse at 8.)  However, as discussed above, defense counsel presented

11  an alternate scenario where Morales killed the victim through evidence that Morales had been

12  seen in the victim's company where the body was found with the victim slumped over, and that

13  a tire mark from Morales' truck was found where the body was dumped.

14  Petitioner contends trial counsel admitted her guilt during closing argument when he said

15  they could not vote guilty if they believed someone other than Petitioner was involved in the

16  murder.  (Traverse at 7-8)  The statement Petitioner refers to consists of the highlighted passage

17  of the concluding paragraph of the following quote from closing argument:

18  Footprints, footprints at the scene.  [¶]  Let me take you over here.  You
    didn't hear about this in opening statement from the prosecution.  You didn't hear
19  about it in closing argument from the prosecution.  Ladies and gentlemen, it
    doesn't fit their picture that Jane Dorotik killed Robert Dorotik and took him and
20  dumped his body.  It doesn't fit their picture, so they don't talk to you about it.
    Heaven forbid you don't consider that.

21
    You have what the experts have told you to be two separate pathways of
22  footprints.  The other expert said to you there are two – four, maybe, separate sets
    of prints.  Ladies and Gentlemen, four separate sets of prints.  And this is at a time
23  where, you know, it's misting sometimes.  It's off-and-on rain.  You know these
    tracks are fresh.  You know the tire tracks are fresh.  They don't mention it to you
24  because it doesn't fit their picture.

25  But ladies and gentlemen, my God, aren't you thinking other people are
    involved in this?  If, ladies and gentlemen, you're thinking other people are
26  involved in that, your decision making is over.  Jane Dorotik is not guilty.  The
    prosecution has put forward to you that Jane Dorotik killed this man and took his
27  body and dumped him there.  This is inconsistent with that.

28

1
2
Ladies and gentlemen, you cannot vote guilty if you believe there are more than one person. **If you think there's more than Jane involved in this**, it's – you can't.

3
(RT vol. 13 at 2499-2500) (emphasis added).

4
5
6
7
8
Taken in context, defense counsel's remark did not convey to the jury that counsel believed Petitioner was guilty. The remark expressed the opinion that if the jury believed that more than one person was involved, as the evidence indicated, Petitioner could not be guilty under the prosecution's theory. Petitioner has failed to show deficient performance or prejudice from this remark.

9
10
11
12
13
14
15
16
17
18
Petitioner contends counsel stated that he did not personally believe the evidence he presented at trial, and that such an admission is a direct violation of counsel's constitutional duty to present a vigorous defense. (Pet. Mem. at 13.) Respondent argues that Petitioner does not explain where or when counsel made such a statement, but because in any event it was not heard by the jury, there could be no prejudice. (Ans. Mem. at 20.) Petitioner provides no details regarding counsel's alleged remark, and has provided no basis for a finding of deficient performance or prejudice based on this allegation. However, assuming Petitioner is referring to the following passage from closing argument, which came immediately after the above quoted passage, it is clear that defense counsel's comment did not communicate a disbelief of the evidence to the jury. Defense counsel stated:

19
20
21
22
23
24
25
I want to say something else. They say to you somehow the body got from – down into the woods. Somehow the body got to the woods. Please, somehow the body got to the woods. [¶] Did Jane Dorotik carry the body over her shoulder, 150 pounds? You heard evidence off and on, and you heard evidence off and on Jane has a crushed hip and there are pins in it. Could she lift 150 pounds? You know, honestly, I don't know. I don't know. Her son said, "Oh, she can probably lift 100, 150 pounds." So I'm thinking in my mind how and you – how can you believe she's lifting 150 pounds? Then it occurred to me, hey, if she's lifting 150 pounds by herself like the prosecution wants you to believe, you're going to see significantly depressed footprints. Instead of 150, 120, 140, whatever, you're going to see twice the indentation, the depth of those footprints. You don't see it because there are two pathways, because two people dropped that body of Robert Dorotik's. That's why you don't see it, ladies and gentlemen.

26
(Id., vol. 13 at 2500-01.)

27
28
Taken in context, the remark does not convey a disbelief in the evidence presented at trial. Rather, it treads a path between asking the jury to believe that Petitioner could not lift and carry

her husband's body, and finding that if she could and did, the footprints found near the body would have had to have been much deeper.  Defense counsel was not deficient in making this comment, and there was no prejudice to Petitioner.  Based on an independent review of the record, the Court finds that the silent denial of this aspect of claim one by the state supreme court was neither contrary to, nor involved an unreasonable application of, Strickland.

**10)  Evidentiary hearing**

Petitioner requests that the Court conduct an evidentiary hearing as to her claims. (Traverse at 3-5.)  Based on the finding in this Report that Petitioner is not entitled to habeas relief as to any claim presented, the Court recommends that Petitioner's request for an evidentiary hearing be denied.  See Bashor v. Risley, 730 F.2d 1228, 1233 (9th Cir. 1984) (holding that an evidentiary hearing is not required on issues which can be resolved on the basis of the state court record).

Accordingly, the Court finds that habeas relief is not available as to those aspects of claim one which were addressed by the appellate court in its written opinion because the state court adjudication of those claims was neither contrary to, nor involved an unreasonable application of, clearly established federal law as announced in Strickland, and was not based on an unreasonable determination of the facts.  The Court also finds that, based on an independent review of those aspects of claim one which were not directly addressed by the state court, Petitioner is not entitled to habeas relief because she has demonstrated neither deficient performance nor prejudice under Strickland, and the silent denial of those aspects of claim one was therefore neither contrary to, nor involved an unreasonable application of, Strickland.

**C.    Claim Two**

Petitioner contends in claim two that her rights under the Fifth and Fourteenth Amendments, as those rights are interpreted in Brady v. Maryland, 373 U.S. 83, 87 (1963), were violated when the prosecution: (a) failed to provide and/or delayed providing police interviews of witnesses Singh and Newton which were favorable to the defense; (b) failed to notify the defense of evidence that the prosecution's forensic expert, Charles Merritt, had made errors in other cases and had employed faulty methodology; (c) denied Petitioner's motion for a new trial,

which resulted in excluding from the jury the testimony of exculpatory witnesses; and (d) failed to subject evidence to testing.  (Pet. Mem. at 32-34.)

Respondent contends that claim two is procedurally defaulted in this Court because it was denied by the state courts on the basis of an independent and adequate state procedural rule which provides that claims which should have been raised on appeal but are not, cannot be raised on collateral review.  (Ans. Mem. at 27, 33-34.)  Alternately, Respondent contends claim two is without merit.  (<u>Id.</u> at 27-33.)  Petitioner replies that she has shown cause and prejudice sufficient to excuse any procedural default. (Traverse at 19.)  Petitioner also argues the merits of claim two.  (<u>Id.</u> at 19-28.)

**1)  Exculpatory witnesses**

Petitioner first contends that the prosecution failed to provide and/or delayed providing police interviews of Singh and Newton, witnesses favorable to the defense, in violation of their duty under <u>Brady</u>.  Petitioner presented this claim, with respect to Newton, in the new trial motion, where she argued that on the evening of the day the jury began its deliberations, the defense was contacted by Newton and was told that she had given a statement to the police one day after the body was found, but the statement was not disclosed to the defense by the prosecution.  (CT 400.)  In her statement to the defense, Newton said that on Sunday between 3:45 p.m. and 4:15 p.m., as she was driving to the store, she saw a man jogging on the side of the road, that on her way back from the store the same man was jogging near where the victim's body was eventually found, and in that same area she saw a black truck with two Native American males driving erratically who looked as if they were under the influence of something. (CT 406.)  She said that sometime during the week after the murder, she contacted an officer she identified as Deputy Sheriff Continelli and told him what she had seen, was told by Continelli that he would let the homicide detectives know what she had said and that she would be contacted if they thought it was important, but was never contacted. (CT 406-07.)  Defense counsel brought the matter to the trial judge's attention while the jury was deliberating, indicated that perhaps a <u>Brady</u> violation had occurred, and asked to reopen the case to present Newton's testimony.  (RT vol. 13 at 2570-73.)

The prosecution opposed the motion to reopen the case to present Newton's testimony, stating that in light of the evidence that the victim was attacked in his bedroom and dressed in his jogging clothes by someone else, it was absurd for the defense to want to reopen the case to present evidence on the theory that the two men in the black truck kidnapped the victim while he was jogging, took him back to his home to kill him, and then returned to the area to dump the body. (Id. at 2573-74.) The prosecution also indicated that if there was any truth to Newton's statement, it involved a different jogger, and stated that the homicide detectives had found other witnesses who had reported seeing other joggers in the area who did not fit the victim's description. (Id. at 2574.) The trial judge denied the motion to reopen the case after finding that extensive investigation by both sides would be necessary before Newton's testimony could be heard by the jury. (Id. at 2578.)

Newton testified at the new trial motion, held about five weeks after the jury returned their verdict, and her testimony was generally consistent with her prior statement. (Id., vol. 14 at 2758-78.) She added additional details not included in her statement, in that she identified the driver of the black pickup truck as Petitioner's farm worker Leonel Morales, and said she was positive that the jogger she saw was the victim, Robert Dorotik. (Id. at 2770-71, 2777-78.) She was shown photographs of the victim in the clothes he was found wearing, and said she was sure it was the same man, even though she said the jogger she saw was wearing different clothes. (Id. at 2784.) She also described the jogger she saw as between six-feet, three-inches and six-feet, five-inches tall, weighing between 220 and 240 pounds, whereas evidence at trial indicated the victim was five-feet, eight and one-half inches tall, and weighed 147 pounds. (Id. at 2784, 2805.) Newton testified that it was sunny and warm when she saw the jogger, whereas testimony at trial indicated it was cold and rainy on Sunday when Petitioner reported her husband missing after going jogging. (Id. at 2792.) Newton said that Lisa Singh was her neighbor, and it was Singh who contacted the defense team and told them Newton had information about the case. (Id. at 2785.) Newton said she gave the information in her original statement to Sergeant Continelli, who was an acquaintance of hers, when she happened to run into him about a week after the murder at her son's school, and that Continelli told her at that

1  time that: "it was out of his hands, that he would have to talk to homicide, and if they needed to

2  get ahold of me, that they would."  (Id. at 2773-74, 2791-92.)

3       The trial court rejected a defense request for a continuance of the new trial motion to

4  locate other witnesses, which included an offer of proof with respect to two additional witnesses,

5  Clyde Walton and Hans Woidtke.  The defense said Walton would testify that he was in the

6  process of acquiring land which was accessed by the driveway next to which the body was

7  found, and he worked there regularly, that when he saw the news report of a missing jogger he

8  recalled seeing a man jogging about nine miles from where the body was found, who generally

9  fit the victim's physical description, and whom he had seen several times in the past jogging

10  with a female, but did not remember what day he had seen the jogger.  (Id. at 2955-58.)  He also

11  said that on the same day he saw the jogger, he saw a black truck knocking down garbage cans

12  in the same area about an hour before he saw the jogger.  (Id. at 2957.)  It was proffered that

13  Woidtke would testify that he lived in the area where the body was found, that on the day the

14  body was found he went to the Rancho Market, the same market Newton said she had visited

15  on the day she saw the victim jogging, and learned from the butcher that two Hispanic men who

16  work down the road told the butcher that they saw two other Hispanic males, on an unstated day,

17  driving a dark pickup truck with a White male who looked like he was asleep sitting between

18  them.  (Id. at 2959-61.)

19       The trial court took additional testimony from Newton and Sergeant Continelli on the

20  Brady issue.  Newton testified that she contacted Continelli at the police station after her initial

21  testimony, that Continelli told her that he had seen her on television following her testimony and

22  it clicked in his head that she had spoke to him around the time the body was found, that he had

23  made a mistake and had confused Newton with Lisa Singh as the person who had reported

24  seeing a jogger and a black truck, and said that so much was going on around the time the body

25  was found that Newton's statement got "clumped" into Singh's statement, which was the reason

26  it was never passed to the homicide detectives.  (Id. at 2983-88, 2992.)  Although Newton had

27  testified that the black truck she saw had black and gold license plates, the parties stipulated that

28  Morales' black pickup truck was registered 14 years after the DMV discontinued issuing black

and gold plates.  (<u>Id.</u> at 3006-07.)  Donald Continelli, a Sergeant with the San Diego Sheriff's Department, testified that Sherry Newton came to the police station the previous day and said she was upset that she had to come back to court to testify that day.  (<u>Id.</u> at 3012-13.)  Continelli apologized for not recognizing her, and said it was when she testified that she brought her son to the police station on a Boy Scouts outing that he remembered her from that trip.  (<u>Id.</u> at 3014.) Continelli said he told Newton that he did not remember seeing or speaking to her at the school as she had testified, testified that he had no recollection that she had reported to him that she saw a jogger and a black truck around the time the body was found, and said that Newton had asked him to come to court and say he did remember.  (<u>Id.</u> at 3015-16, 3034.)

The trial judge denied the defense motion for a continuance of the new trial motion, characterizing the request to investigate the statements of Walton and Woidtke as a fishing expedition.  (<u>Id.</u> at 3048.)  The court found no <u>Brady</u> violation because there was no credible evidence that Newton gave a statement to Continelli at or near the time the body was found, in that Newton was not a credible witness.  (<u>Id.</u> at 3055-58.)  The trial judge went on to state that even assuming the jury could disagree as to Newton's credibility, the defense had failed to demonstrate materiality because her testimony did not in any sense contradict the strong evidence tying Petitioner to the murder.  (<u>Id.</u> at 3058.)  Specifically, the judge found that the evidence at trial strongly suggested that more than one person was responsible for dumping the victim's body, as evidenced from the fact that two sets of tire tracks which matched Petitioner's truck and Morales' truck were found where the body was dumped, and there were two sets of footprints leading to the body, and possibly because both Claire Dorotik and Leonel Morales had invoked their Fifth Amendment right not to implicate themselves, but that in any case the evidence tying Petitioner to the murder was not affected by evidence supporting the theory that other people were involved.  (<u>Id.</u> at 3059.)  This evidence included Petitioner's own admission that she was the only person on the property at the time of death, that she lied to the police when she said the victim was out jogging and lied to neighbors when she said the victim was recovering from the flu, she was seen heading toward the dumpsters in the back of the Vons store driving the vehicle which was used to dump the body shortly after the body was dumped,

1    she was able to describe the clothes the victim was wearing when the evidence established he

2    was dressed in those clothes after he was killed, the victim's blood was all over the bedroom

3    where Petitioner said the victim slept the night he was likely killed, and Petitioner's fingerprint

4    in the victim's blood was found on the syringe in their bedroom.  (<u>Id.</u> at 3059-61.)

5            Petitioner did not raise the <u>Brady</u> issue regarding the withholding of Singh's statement

6    to the police in the new trial motion, and did not raise any <u>Brady</u> issue on appeal.  Rather,

7    Petitioner presented claim two to the state supreme court in a habeas petition which was

8    summarily denied without a statement of reasoning or citation of authorities.  (Lodgment Nos.

9    13-14.)  Petitioner argued in that habeas petition, as she does in her federal Petition here, that

10   Singh gave a statement to the police on the day the body was discovered that she had seen the

11   victim in a black truck, slumped over, sitting between two men a few feet from where the body

12   was found, but that she was not contacted by the homicide detectives until 15 months later, at

13   which time she was informed by the police that she was mistaken.  (Lodgment No. 13 at 16-17,

14   32-34.)  Petitioner also contended in her state habeas petition, as she does here, that Sherry

15   Newton gave a statement to the police around the time of the murder which was never turned

16   over to the defense.  (<u>Id.</u> at 17, 32-34.)  Petitioner presented the same claim in a habeas petition

17   filed in the appellate court.  (Lodgment No. 11.)  The appellate court denied the habeas petition,

18   stating:

19           Petitioner also claims error under *Brady v. Maryland* (1963) 373 U.S. 83,
         87, contending the prosecution failed to provide or delayed in providing police
20       interviews with witnesses favorable to the defense.  This issue was part of her
         motion for new trial and could have been raised on direct appeal.  Absent special
21       circumstances that excuse a failure to raise the issue on appeal, such failure
         generally precludes review in a post-conviction petition for writ of habeas corpus.
22       (*In re Harris* (1993) 5 Cal.4th 813, 829.)  Petitioner has not shown special
         circumstances excusing her failure to raise this claim on appeal.
23

24   (Lodgment No. 12, <u>In re Dorotik</u>, No. D047784, slip op. at 2.)

25           Respondent first contends claim two is procedurally defaulted because it was denied on

26   the basis of an adequate and independent state procedural rule.  (Ans. Mem. at 33-34.)  A federal

27   habeas court will be prevented from addressing the merits of a claim due to a procedural default

28   only if the applicable state bar is "adequate" to support the judgment and "independent" of

federal law.  Coleman v. Thompson, 501 U.S. 722, 729-30 (1991).  A state procedural rule is "independent" if it is not interwoven with federal law.  LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001).  A state rule is "adequate" if it is "clear, consistently applied, and well-established" at the time of the default.  Calderon v. United States District Court, 96 F.3d 1126, 1129 (9th Cir. 1996).  Respondent bears the initial burden of "demonstrating that the bar is applicable."  Bennett v. Mueller, 322 F.3d 573, 586 (9th Cir. 2003).

Respondent argues that claim two is procedurally defaulted because the state court relied on the Harris rule, which provides that claims which should have been, but were not, presented on direct appeal, are not properly raised on habeas.  Respondent contends this is an adequate and independent state procedural rule which supports a procedural default in this Court.

### a.    Independent

For a state procedural rule to be "independent," the state law basis for the decision must not be interwoven with federal law.  Harris v. Reed, 489 U.S. 255, 265 (1989); Michigan v. Long, 463 U.S. 1032, 1040-41 (1983).  A ground is "interwoven" with federal law if "the State has made application of the procedural bar depend on an antecedent ruling on federal law, that is, the determination of whether federal constitutional error has been committed."  Ake v. Oklahoma, 470 U.S. 68, 75 (1985); Bennett, 322 F.3d at 581-82.

The default occurred here, at the earliest, when Petitioner failed to present her Brady claim on direct appeal when she filed her opening brief on November 13, 2002.  Calderon v. U.S. District Court, 103 F.3d 72, 75 (9th Cir. 1996).  The Ninth Circuit has already found that, for cases where the default occurred after the California Supreme Court announced In re Robbins, 18 Cal.4th 770 (1998), as here, the Harris rule at issue here is independent of federal law.  Bennett, 322 F.3d at 581-82.  Thus, the Court finds that the state procedural bar at issue here is independent of federal law.

### b.    Adequate

"A state procedural rule constitutes an adequate bar to federal habeas review if it was 'firmly established and regularly followed' at the time it was applied by the state court."  Poland v. Stewart, 169 F.3d 573, 585 (9th Cir. 1999), quoting Ford v. Georgia, 498 U.S. 411, 424

(1991).  The Ninth Circuit has observed that the state supreme court in In re Harris, 5 Cal.4th 813 (1993), "reaffirmed the rule's continued vitality and narrowed the available exceptions to the rule."  Calderon, 103 F.3d at 75.  Thus, Respondent has demonstrated that the Harris rule applied here was firmly established at the time of the default.  Bennett, 322 F.3d at 579.

A state procedural bar must also be "regularly followed" in order to support a procedural default.  Ford, 498 U.S. at 424.  The Ninth Circuit stated in Bennett that:

> Once the state has adequately pled the existence of an independent and adequate state procedural ground as an affirmative defense, the burden to place that defense in issue shifts to the petitioner.  The petitioner may satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule.  Once having done so, however, the ultimate burden is the state's.

Bennett, 322 F.3d at 586.

Respondent has adequately pled the existence of an independent and adequate procedural bar and the burden has shifted to Petitioner.  Petitioner does not contend the rule at issue here has been inconsistently applied, but argues that she has shown cause and prejudice sufficient to excuse the default.  (Traverse at 19.)  The Court finds that Petitioner has not satisfied her burden of "asserting specific factual allegations that demonstrate the inadequacy" of the state procedural rule, and the burden has not shifted back to Respondent.  Bennett, 322 F.3d at 586.  Thus, the Court will not consider Petitioner's Brady claim unless she demonstrates cause and prejudice to excuse the default, or if a fundamental miscarriage of justice would result from the Court's refusal to consider the claim.

### c.      Cause

The cause prong can be satisfied if Petitioner demonstrates some "objective factor" that precluded her from raising her claims in state court, such as interference by state officials or constitutionally ineffective counsel.  McCleskey v. Zant, 499 U.S. 467, 493-94 (1991).  In Edwards v. Carpenter, 529 U.S. 446 (2000), the Supreme Court stated:

> Although we have not identified with precision exactly what constitutes "cause" to excuse a procedural default, we have acknowledged that in certain circumstances counsel's ineffectiveness in failing properly to preserve the claim for review in state court will suffice.  [Murray v. Carrier, 477 U.S. 478, 488-89 (1986)]  Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution.

*Ibid.* In other words, ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim. And we held in *Carrier* that the principles of comity and federalism that underlie our longstanding exhaustion doctrine--then as now codified in the federal habeas statute, see 28 U.S.C. §§ 2254(b), (c)--require *that* constitutional claim, like others, to be first raised in state court. "(A) claim of ineffective assistance," we said, generally must "be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Carrier*, *supra*, at 489.

*Edwards*, 529 U.S. at 451-52. In the habeas petition filed in the state supreme court, Petitioner contended that the claims presented had not been raised on direct appeal because they relied on evidence outside the record and due to ineffective assistance of counsel. (Lodgment No. 13 at 5.) As discussed above, claim two is not based on information outside the record, but is based on evidence presented at trial with respect to Singh, and evidence presented at the new trial motion with respect to Newton. Petitioner has not demonstrated cause based on her trial or appellate attorneys' performance because defense counsel actually raised the issues in the trial court, and because she has not presented a claim regarding ineffective assistance of appellate counsel to the state courts. *Edwards*, 529 U.S. at 453. However, even assuming Petitioner could establish sufficient cause to excuse the default, as outlined below, she has failed to establish prejudice.

### d.   Prejudice

To establish the prejudice necessary to overcome a procedural default, Petitioner must show "not merely that the errors at [her] trial created a *possibility* of prejudice, but that they worked to [her] *actual* and substantial disadvantage, infecting [her] entire trial with error of constitutional dimensions." See United States v. Frady, 456 U.S. 152, 170 (1982) (discussing prejudice where defendant failed to object to jury instructions in proceeding under § 2255). "Prejudice [to excuse claims procedurally barred in a habeas case] is actual harm resulting from the alleged error." Vickers v. Stewart, 144 F.3d 613, 617 (9th Cir. 1998).

Clearly established federal law provides that in order to prove a Brady violation, a petitioner must show that: "(1) the evidence was exculpatory or impeaching; (2) it should have been, but was not produced; and (3) the suppressed evidence was material to [her] guilt or punishment." Paradis v. Arave, 130 F.3d 385, 392 (9th Cir. 1997). Evidence is material "if

1  there is a reasonable probability that, had the evidence been disclosed to the defense, the result

2  of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 433-34 (1995).

3         First, Petitioner has failed to show that the prosecution withheld any statements. The trial

4  judge found Newton's testimony that she made a statement to Sergeant Continelli not to be

5  credible, and accepted Continelli's testimony that Newton never made such a statement. This

6  Court must defer to the state court's credibility determination if it is fairly supported by the

7  record. Carriger v. Stewart, 132 F.3d 463, 473 (9th Cir. 1997). As set forth in detail above,

8  Newton's lack of credibility is amply supported by the record, including her request to Continelli

9  to testify falsely that he remembered that she gave him a statement around the time the body was

10 found, as well as her insistence that the man she saw jogging was the victim, despite the fact that

11 she said the man she saw was wearing different clothes than the victim and was a much taller

12 and heavier person, and the fact that she described that day as sunny and warm when everyone

13 else testified it was cold and rainy.

14        Petitioner's allegation that the prosecution withheld Singh's statement to the detective

15 made the day the body was found is not supported by the record. Just prior to the prosecution

16 resting its case, defense counsel informed the court that although he had received in pre-trial

17 discovery a report by Detective Ryzdynski indicating that Singh had made a statement to

18 Ryzdynski on the day the body was found, the defense had not contacted Singh until recently.

19 (RT vol. 13 at 2283-85.) Defense counsel complained that the statement turned over by the

20 prosecution did not include the details that Singh had seen a vehicle with three people, with the

21 man in the middle drooping, and had identified that man from a photograph as the victim. (Id.

22 at 2284.) However, in the recorded statement given to the police by Petitioner, and heard by the

23 jury, the detective interviewing Petitioner, in explaining why Petitioner was being asked about

24 anyone who might own a black pickup truck, told Petitioner that a woman said she had seen a

25 small black truck in the area where the body was found, that she had become worried when the

26 press began asking her questions, and that she had told the press everything she told the police.

27 (Id., vol. 8 at 1284; CT 374.) Petitioner attaches a copy of a newspaper story published the day

28 after the body was found, which reports that the police planned to question a witness who had

told them that she saw the victim in a truck with two men in the area Sunday between 5:00 p.m. and 7:30 p.m.  (Traverse, Ex. 1.)  Thus, defense counsel was provided with Singh's statement to the police in pretrial discovery, was independently aware of the full contents of her statement through the newspaper article, interviewed her before the prosecution rested its case, and called her as a trial witness.  There is no basis for a finding that the prosecution withheld Singh's statement.

However, assuming the full content of Singh's statement was withheld, and/or assuming Newton made a statement to Continelli which was withheld, Petitioner has failed to demonstrate that the statements were material to her guilt or punishment.  Petitioner contends that the result of her trial would have been different if the jury had heard Newton's testimony because it would have given further support to the evidence that Morales was involved or that the men in the black truck were responsible for killing the victim.  As the trial judge noted, Newton's statement obviously involved a different jogger who was wearing different clothes than the victim, was much taller and much bigger than the victim, and was out jogging on a warm sunny day.  Such evidence would not have had any effect on the jury's determination regarding Petitioner's involvement in the attack of her husband in the bedroom they shared at a time when they were the only two people home.  As discussed in detail with respect to claim one, Petitioner was by her own admission the only person on the ranch on Saturday night and all day Sunday, the time period the attack likely occurred, she was able to accurately describe the victim's clothes when she reported the victim missing despite the fact that he had been dressed in those clothes after he was attacked, and she told the police he went jogging when the physical evidence established that he had not been jogging.  Defense counsel presented evidence that someone else was involved in dumping the body, argued to the jury that it was obvious that someone else was involved, implied that it was Morales or Claire, both of whom invoked their Fifth Amendment right not to testify, and argued that if the jury found that someone else was involved they were required to find Petitioner not guilty.  Singh's testimony implied that the two men she said she saw, who may have been Morales and another farm worker, who were sitting in a black pickup truck, which may have belonged to Morales, with the victim slumped between them, dumped

1    the body.  That evidence does not call into question Petitioner's guilt, but merely suggests that

2    an accomplice dumped the body.  Moreover, Newton's testimony obviously involved a different

3    jogger, and the police had received other reports from other witnesses about other joggers in the

4    area.  Additional testimony by Newton regarding a black truck driven by two impaired men in

5    the area where the body was found on a warm and sunny day near where a different man was

6    jogging was not material to Petitioner's guilt or punishment, because it relates at best only to the

7    dumping of the body, not to the fact that the victim was attacked in his bedroom and dressed

8    after he was killed.  With respect to Newton's testimony, there is no "reasonable probability that,

9    had the evidence been disclosed to the defense, the result of the proceeding would have been

10   different."  Kyles, 514 U.S. at 433-34.

11          Petitioner argues that the fact that the substance of Singh's testimony was discovered late

12   in the case prevented the defense from discovering witnesses Newton, Walton and Woidtke.

13   However, as set forth above, these witnesses provided evidence, at best, only as to the disposal

14   of the body.  Any testimony they could provide regarding seeing a jogger and a black truck in

15   the area would have been cumulative to the evidence presented at trial.  Even assuming it would

16   not have been cumulative, it was not material to Petitioner's guilt or punishment for the same

17   reason discussed above that Newton's testimony was not material.

18          Accordingly, the Court finds that Petitioner has failed to demonstrate cause or prejudice

19   to excuse the procedural default with respect to the aspect of claim two alleging that the

20   prosecution withheld statements from exculpatory witnesses.

21                    **e.        Fundamental Miscarriage of Justice**

22          The Court may also reach the merits of a procedurally defaulted claim if Petitioner can

23   demonstrate that the failure to do so would result in a fundamental miscarriage of justice.  The

24   Supreme Court has limited the "miscarriage of justice" exception to habeas petitioners who can

25   show that "a constitutional violation has probably resulted in the conviction of one who is

26   actually innocent."  Schlup v. Delo, 513 U.S. 298, 327 (1995).  "Actual innocence" means

27   factual innocence, not merely legal insufficiency; a mere showing of reasonable doubt is not

28   enough.  See Wood v. Hall, 130 F.3d 373, 379 (9th Cir. 1997).

To show actual innocence, Petitioner must show that it is more likely than not that no reasonable juror would have found her guilty beyond a reasonable doubt. Id. Petitioner has failed to carry this burden. As set forth above, the best case scenario is that Newton or Singh's testimony would support a finding that someone assisted Petitioner in disposing of the body. It would not call into question her involvement in the actual killing of the victim. Petitioner has failed to demonstrate factual innocence sufficient to demonstrate that a fundamental miscarriage of justice would arise from the failure to reach the merits of this aspect of claim two.

Based on the forgoing, the Court finds that the exculpatory witness aspect of claim two is procedurally defaulted, that Petitioner has failed to demonstrate cause and prejudice to excuse the default, and that a fundamental miscarriage of justice would not result from the Court's failure to consider the merits of the claim. Accordingly, the Court recommends that habeas relief be denied as to that aspect of claim two alleging a <u>Brady</u> violation arising from the failure of the prosecution to turn over exculpatory witness statements to the defense. Alternately, to the extent the Court could reach the merits of this aspect of claim two, the Court finds the claim to be without merit for the same reasons set forth above with respect to Petitioner's failure to demonstrate prejudice to excuse the procedural default.

**2)  Expert witness**

Petitioner next contends that the prosecution failed to notify the defense of evidence that the prosecution's expert witness had made errors in other cases and had employed faulty methodology. Specifically, she contends that Charles Merritt made findings regarding the blood evidence that are inconsistent with the post-conviction forensic report obtained by Petitioner and attached to the Petition as Exhibit 1, and contends that the documents attached as Exhibit 7 to the Petition show that Merritt's conclusion in the case of Cheri Dale regarding a hair sample was later determined to be incorrect and that Merritt has a poor reputation for reliability. (Pet. Mem. at 19-20.) This aspect of claim two was presented to the state supreme and appellate courts in the same manner as it is presented here. (Lodgment No. 13 at 32; Lodgment No. 11 at 22.) The state supreme court issued a silent denial of the petition in which this aspect of claim two was presented, and the appellate court denied the petition without addressing this aspect of claim two.

1   (Lodgment Nos. 12, 14.)   This aspect of claim two was not presented to the trial court.

2   (Lodgment No. 9.)

3          Because there is no reasoned decision from the state courts with respect to this aspect of

4   claim two, the Court must conduct an independent review of this claim.  Pirtle, 313 F.3d at 1167.

5   As Respondent points out, the impeachment evidence Petitioner relies on to show a discovery

6   violation consists of a number of documents submitted to defense counsel by Petitioner's brother

7   on March 26, 2001, well before trial started on May 15, 2001.  (Pet. Ex. 7.)  Thus, even

8   assuming the prosecution was required to disclose public information about its own expert's

9   prior questionable testimony, the defense was in possession of this information prior to trial.  In

10  any case, the forensic evidence was very strong and involved a great deal of blood evidence

11  found in the bedroom.  Petitioner has not shown that challenging the prosecution's expert's

12  ability would have diminished in any way the impact on the jury of the forensic evidence,

13  particularly in light of the fact that the defense consulted its own forensic expert prior to trial.

14  Because the evidence presented by Petitioner does not provide "a reasonable probability that,

15  had the evidence been disclosed to the defense, the result of the proceeding would have been

16  different," it was not material.  Kyles, 514 U.S. at 433-34.

17          **3) Motion for a new trial**

18          Petitioner alleges the prosecution violated Brady by denying her motion for a new trial,

19  thereby preventing the jury from hearing the testimony of exculpatory witnesses.  (Pet. Mem.

20  at 32.)  Obviously, the prosecution did not deny the defense motion; it was denied by the trial

21  judge.  However, the Court will liberally construe this claim as one alleging a violation of Brady

22  based on the prosecution's failure to advise the defense that Newton had made a statement to the

23  homicide detectives, which in turn prevented the defense from calling Newton, Walton and

24  Woidtke to testify at trial, which was the subject of the new trial motion.  For the reasons

25  discussed above with respect to the exculpatory witness aspect of claim two, this aspect of claim

26  two is procedurally defaulted, Petitioner has failed to show cause or prejudice to excuse the

27  default, no fundamental miscarriage of justice would arise if the Court refused to reach the

28  merits of the claim, and the claim is without merit.

1

**4) Failure to conduct testing**

2          Finally, Petitioner contends "that the prosecution purposely failed to do testing which

3   would have cast doubt on the prosecution's theory of the case, and the prosecution failed to

4   provide DNA testing which would have tended to exonerate Petitioner." (Pet. Mem. at 34.) This

5   aspect of claim two was presented to the state supreme and superior courts in the same manner

6   as it is presented here. (Lodgment No. 13 at 34; Lodgment No. 9 at 4.) This aspect of claim two

7   was not presented to the appellate court. Thus, the last reasoned decision addressing this claim

8   is the superior court order denying the habeas petition. The superior court stated:

9                Petitioner also claims on information and belief that the prosecution
             purposely failed to do testing which would have cast doubt on their theory of the
10           case and failed to provide DNA testing which would have exonerated her.
             Petitioner's claim in this regard is woefully inadequate as no facts are alleged to
11           support the claim. Petitioner does not claim the evidence which should have been
             tested has been destroyed, so this does not appear to be a proper claim pursuant
12           to <u>California v. Trombetta</u> (1984) 467 U.S. 479. Petitioner has not stated what
             evidence the People purposely failed to test or what DNA evidence would have
13           exonerated her, nor do they request the right to test any evidence for DNA. As
             such, this claim must also fail.

14

15   (Lodgment No. 10, <u>In re Dorotik</u>, No. HCN0787, slip op at 3-4.)

16          Petitioner does not specifically identify what testing she is referring to in support of this

17   claim, and did not do so in the state courts. However, to the extent it is a reference to the testing

18   identified above with respect to claim one, she has failed to satisfy any of the <u>Brady</u>

19   requirements. Petitioner alleged in claim one that testing should have been, but was not,

20   conducted on the rope found around the victim's neck, the victim's shoelaces, fingernail

21   scrapings from the victim, fingerprints on the truck, blood on a towel found under the mattress,

22   fingernail scrapings of farm workers Morales and Armando, black flecks of material found in

23   the victim's scalp, and the area in and around the potbelly stove. (Pet. Mem. at 14-15.)

24   Petitioner has not shown that the failure to conduct testing on any of these items, all of which

25   were available for the defense for testing, was a failure of a duty of the prosecution.

26          Neither has Petitioner shown that the result of any testing would lead to discovery of

27   material evidence. As set forth above with respect to claim one, Petitioner has not shown that

28   testing would have revealed exculpatory or impeaching evidence. Rather, she provides bare

speculation that testing might have revealed DNA pointing to involvement by someone else in the crime.  At best, the existence of other DNA would support an inference that Petitioner had an accomplice, but would not explain how Petitioner was able to describe the clothing the victim was wearing when found even though he had been dressed after he was attacked.  Thus, even assuming the prosecution had some duty to conduct testing on these items, because there does not exist a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," no material evidence was withheld by the prosecution.  <u>Kyles</u>, 514 U.S. at 433-34.

In sum, the Court finds that the exculpatory witness aspect of claim two is procedurally defaulted, that Petitioner has failed to demonstrate cause and prejudice to excuse the default, and has not shown that a fundamental miscarriage of justice would result from the Court's refusal to consider the merits of this aspect of claim two.  Alternately, to the extent this aspect of claim two is not procedurally defaulted, the Court finds it to be without merit.  The Court finds, based on an independent review of the expert witness and new trial motion aspects of claim two, that habeas relief is unavailable because those aspects of claim two are without merit.  Finally, the Court finds that the state superior court's adjudication of the failure to conduct testing aspect of claim two is neither contrary to, nor involved an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts.  The Court therefore recommends habeas relief be denied as to claim two.

## VI.

## <u>CONCLUSION AND RECOMMENDATION</u>

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) directing that judgement be entered denying the Petition.

**IT IS ORDERED** that no later than **September 30, 2008**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

/ / /

1    **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the

2    Court and served on all parties no later than **October 10, 2008**.  The parties are advised

3    that failure to file objections with the specified time may waive the right to raise those objections

4    on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998);

5    Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

6    

7    DATED:  August 19, 2008

8    _____

9    LOUISA S PORTER
     United States Magistrate Judge

10   CC:        HON. NAPOLEON A. JONES, JR.
                ALL PARTIES

11   

12   

13   

14   

15   

16   

17   

18   

19   

20   

21   

22   

23   

24   

25   

26   

27   

28   

07cv1007