# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

JANE M. DOROTIK,                                 )  Case No. 07cv1007 J (POR)
                               )
                Petitioner,     )  **ORDER:**
                               )
                               )  **(1) ADOPTING MAGISTRATE JUDGE PORTER'S REPORT AND RECOMMENDATION;**
       vs.                                        )
                               )
                               )  **(2) DENYING PETITION FOR WRIT OF HABEAS CORPUS;**
DAWN DAVIDSON, Warden                    )
                               )
                Respondent.    )  **(3) DENYING REQUEST FOR EVIDENTIARY HEARING; and**

**(4) DENYING REQUEST FOR APPOINTMENT OF COUNSEL**.

_____

        Before the Court is Magistrate Judge Louisa S. Porter's Report and Recommendation ("R&R") recommending that the Court deny the Writ of Habeas Corpus, filed pursuant to 28 U.S.C. § 2254, of Petitioner Jane M. Dorotik ("Petitioner"). [Doc. No. 1.] The Court has considered the Petition, Respondent's Answer, Petitioner's Traverse, Petitioner's Objections to the R&R, and all the supporting documents the parties have submitted. Having considered these documents, this Court **ADOPTS** the R&R and **DENIES** the Petition for the reasons stated below.

### Factual Background

        This Court gives deference to State court findings and presumes their correctness. If Petitioner wishes to rebut the presumption of correctness, she bears the burden of proving that the State court was incorrect by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); _see also Parke v. Raley_, 506 U.S. 20, 35-36 (1992) (holding that findings of historical fact,

1   including inferences properly drawn from such facts, are entitled to statutory presumption of

2   correctness).  Petitioner has not provided the Court with clear and convincing evidence that

3   the state court erred in its findings of fact.

4          The following statement of facts is taken from the appellate court opinion affirming

5   Petitioner's conviction on direct review.

6          In February 2000 appellant and her husband Robert Dorotik (Robert) were
    living on a ranch they rented in a rural area near Escondido.  The pair had three
7   adult children.  Appellant and Robert frequently argued about money.  Appellant
    and daughter Claire were horse enthusiasts.  Robert disapproved of the money
8   spent by appellant to support that interest.  The couple was not particularly
    affectionate, sometimes discussed divorce, but never had a physical confrontation.

9          In 1997 appellant and Robert separated.  Robert filed for divorce and
10  sought spousal support from appellant whose employment was considerably more
    remunerative.  The couple reconciled in 1998 and resided together at the ranch,
11  agreeing to keep their finances separate.  Their relationship was uneven and at
    times they argued.  Robert started a business but it did not do well.

12         On the evening of [Sunday,] February 13, 2000, appellant called friends
13  and asked if they had seen Robert.  Appellant explained Robert had gone for a run
    at 1:00 p.m. and had not returned.  Appellant called the sheriff and reported
14  Robert missing.  A search was undertaken.  The next day a sweatshirt, which
    appellant stated Robert was wearing on his run, was found on a road about two
15  miles from appellant's home.  Shortly thereafter, Robert's body was found in
    brush next to a road about a half mile from where the sweatshirt was located.
16  Appellant was notified.  She started to cry and asked if her husband had suffered.

17         It was determined that Robert died from blunt force injures to the head,
18  with ligature strangulation as a contributing factor.  He suffered at least three
    blows to the head.  He had two large lacerations at the right side and back of the
19  head with skull fractures underneath those lacerations and direct damage to the
    brain at the back of the head.  There was a depressed skull fracture on the right
20  side of the head.  In the back of the head the bone was completely displaced and
    there was a hole in the skull.  Robert had abrasions on his face and a ligature mark
21  on his neck.  There were abrasions and contusions on his hands that appeared to
    be defensive wounds.  Robert was alive when strangled.  An expert concluded the
22  damage to Robert's head was consistent with hammer strikes.

23         The police interviewed appellant on February 13, 2000.  She told the
    officers that about 1:00 p.m. Robert told her he was going to jog.  She went to the
24  barn and did not see him leave.  When she returned to the house at 4:00 p.m.,
    Robert was not there.  When he had not returned by 5:00 p.m., she went out
25  looking but could not find him.  She then called the police.  Appellant told the
    officers she and Robert each had a $250,000 life insurance policy with the other
26  as beneficiary.

27         A search was conducted of appellant's residence.  Bloodstains were found
28  in several areas in the master bedroom.  The patterning of some of the stains was
    consistent with a beating occurring in the room.  When officers turned over the

2

mattress in the room, they found a large-volume bloodstain near the headboard. There was a folded, bloodstained towel between the mattress and box springs. In a bag in the master bedroom the officers found a syringe containing a horse tranquilizer. A bloody fingerprint was found on one of the syringes. The print was identified as appellant's. A bed sheet was found in a hamper with transfer, drip and impact blood spatters on it. A steam shampooer and cleaning supplies were found in a living room closet. Blood was found on the handle, cap and nozzle of one of the bottles. Bloodstains were also found in the bed of a truck used at the ranch. DNA testing indicated many of these bloodstains were consistent with Robert's blood.

An expert in bloodstain patterning opined that the events started on the bed in the master bedroom. Robert was struck at least twice and perhaps a third time on the bed. He remained on the bed for a time after the assault. At some point Robert moved or was moved to another area in the bedroom where he was struck at least once more. Robert remained in that area for some time.

The expert also examined the clothes from Robert's body. There were transfer but no spatter stains on his T-shirt. There was no blood on his sweatpants. There were two bloodstains and a large amount of feces on Robert's boxer shorts. There was no blood on his shoes.

Appellant did not testify. She offered evidence suggesting that someone else killed Robert.

(Lodgment No. 6, *People v. Dorotik*, No. D038706, slip op. at 2-4.)

### Procedural Background

In a one-count felony Complaint filed in the San Diego County Superior Court on February 22, 2000, refiled as an Information on November 1, 2000, Petitioner was charged with one count of premeditated murder in violation of Cal. Penal Code sections 187(a) and 189. (Lodgment No. 1, Clerk's Tr. ["CT"] 1-4.) On June 12, 2001, a jury found Petitioner guilty of murder and separately found that the murder was premeditated. (CT 323.) On August 2, 2001, Petitioner was sentenced to twenty-five years to life in state prison. (*Id.* at 497.)

Petitioner appealed her conviction, raising claims which are not presented here. (Lodgment Nos. 3-5.) The appellate court, in an unpublished opinion, affirmed the judgment of conviction in all respects. (Lodgment No. 6, *People v. Dorotik*, No. D038706 (Cal.Ct.App. Nov. 18, 2003).) Petitioner filed a petition for review in the state supreme court presenting the same claims, which was summarily denied. (Lodgment Nos. 7-8.)

Petitioner filed a habeas petition in the state superior court on April 4, 2005, presenting essentially the same claims raised in her federal Petition here. (Lodgment No. 9.)

That petition was denied on the merits and on procedural grounds. (Lodgment No. 10, *In re Dorotik*, No. HCN0787 (Cal.Sup.Ct. Aug. 2, 2005).) Petitioner took her habeas petition to the appellate court on January 3, 2006, now proceeding pro se, where she submitted claims similar to those counsel had raised in superior court. (Lodgment No. 11.) That petition was also denied on the merits and on procedural grounds. (Lodgment No. 12, *In re Dorotik*, No. D047784 (Cal. Ct.App. Sept. 2, 2005).) Petitioner presented similar claims to the ones raised in the lower courts in a habeas petition filed in the state supreme court on November 20, 2006, which was denied without citation or a statement of reasoning. (Lodgment Nos. 13-14.)

On June 1, 2007, Petitioner filed a Petition for Writ of Habeas Corpus with this Court [doc. no. 1], as well as a Motion for Leave to Proceed In Forma Pauperis [doc. no. 2] and a Motion to Appoint Counsel and Request for DNA Testing [doc. no. 3]. The Court denied Petitioner's request to proceed in forma pauperis and dismissed the case without prejudice on June 15, 2007. [Doc. No. 4.] Petitioner paid the filing fee on July 2, 2007 [doc. no. 6] and Magistrate Judge Porter ordered the case to be reopened on July 9, 2007 [doc. no. 7]. On July 23, 2007, Magistrate Judge Porter denied without prejudice Petitioner's request for appointment of counsel and request for DNA testing. [Doc. No. 8.]

Respondent Warden Dawn Davidson ("Respondent") filed an Answer to the Petition accompanied by a Memorandum of Points and Authorities in Support Thereof on October 9, 2007. [Doc. No. 11.] Petitioner submitted a Traverse on December 13, 2007. [Doc. No. 17.] On August 19, 2008, Magistrate Judge Porter filed an R&R recommending that Petitioner's habeas petition be denied. Petitioner filed objections nunc pro tunc on October 24, 2008. [Doc. Nos. 20, 29.]

### *Legal Standard*

### I. State Habeas Prisoner Standard

A federal court must grant habeas relief to a petitioner in state prison if the petitioner is in custody "in violation of the Constitution or other laws or treaties of the United States." 28 U.S.C. § 2254(a). A federal court's duty in examining a state prisoner's habeas petition is governed by 28 U.S.C. § 2254 as amended by the 1996 Antiterrorism and Effective Death

Penalty Act ("AEDPA").  Pursuant to section 2254, a federal court may grant habeas corpus relief from a state-court judgment only if the adjudication was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  State interpretation of state laws and rules cannot serve as the basis for a federal habeas petition, as no federal or constitutional question would be implicated.  *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (stating that "federal habeas corpus relief does not lie for errors of state law"; federal courts may not reexamine state court determinations on state law issues).

## II.  Reviewing Magistrate Judge's R&R

The duties of a district court in connection with a magistrate judge's R&R are set forth in Rule 72(b) of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1).  A district court must "make a *de novo* determination of those portions of the report . . . to which objection is made," and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3) (2007); *see also United States v. Raddatz*, 447 U.S. 667, 676 (1980) ("[I]n providing for a '*de novo*' determination . . . Congress intended to permit whatever reliance a district judge, in exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations.").

### *Petitioner's Objections*

Because Petitioner has filed objections to the R&R, this Court must conduct a *de novo* review of the portions of the R&R to which objections were made.  Petitioner objects to the R&R by claiming that "her confinement is in violation of the Constitution."  [Doc. No. 29.] She further argues that (1) she is entitled to an evidentiary hearing because she has established a colorable claim for relief and was denied an evidentiary hearing in state court, (2) the court should order DNA testing of the rope used to strangle the decedent, the hair wrapped around the decedent's finger, and fingernail scrapings of the decedent because the DNA found on these items might help identify the real perpetrator, and (3) she should be excused from the procedural default of her *Brady* claim because she has established cause

1    and prejudice and demonstrated that the Court's failure to reach the merits of her claim

2    would result in a fundamental miscarriage of justice.

3                                                      *Discussion*

4    **I.  Petitioner's Ineffective Assistance of Counsel Claims**

5    **A.  Standard of Review**

6           When the highest state court issues a decision in a case but does not articulate the

7    rationale for its determination, such as by issuing a silent denial, the silence is deemed to be

8    consent to the lower court's decision, and the reviewing court should "look through" to the

9    "last reasoned opinion" to determine the legal basis for the denial.  *Ylst v. Nunnemaker*, 501

10   U.S. 797, 804 (1991).

11          Alternatively, when the state court reaches a decision on the merits but provides no

12   reasoning to support its conclusion, the reviewing court is required to conduct an

13   independent review of the record to determine whether the state supreme court clearly erred

14   in its application of controlling federal law when it denied the claim without a statement of

15   reasoning.  *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *Greene v. Lambert*, 288

16   F.3d 1081, 1089 (9th Cir. 2002) ("[W]hile we are not required to defer to a state court's

17   decision when that court gives us nothing to defer to, we must still focus primarily on

18   Supreme Court cases in deciding whether the state court's resolution of the case constituted

19   an unreasonable application of clearly established federal law.").  In independently reviewing

20   the record, the reviewing court must "still defer to the state court's ultimate decision."  *Pirtle*,

21   313 F.3d at 1167.

22          Petitioner presented ten ineffective assistance of counsel claims in habeas petitions

23   filed in the state superior, appellate, and supreme courts.[1]  The superior court denied

24   Petitioner's claim on the merits in a written order, but addressed only the first two of

25   Petitioner's ineffective assistance of counsel claims.  (Lodgment No. 10, *In re Dorotik*, No.

26   HCN0787, slip op at 2-3.)  The appellate court did the same, addressing only the first two of

27

28
_____

[1] Petitioner's ten ineffective assistance of counsel claims are listed below.  *See infra* Part I.B.

1  Petitioner's ineffective assistance of counsel claims on the merits.[2]   The supreme court

2  summarily denied all ten of Petitioner's ineffective assistance of counsel claims without a

3  statement of reasoning or citation of authorities.  (Lodgment Nos. 13-14.)

4         Because the appellate court issued a reasoned opinion denying Petitioner relief based

5  on her first two claims, while the state supreme court issued a silent denial as to these claims,

6  the Court will look through the state supreme court's order to the appellate court's decision

7  on the merits to determine the legal basis for the denial of Petitioner's first two ineffective

8  assistance of counsel claims.

9         As for Petitioner's third through tenth ineffective assistance of counsel claims,

10  because there are no state court opinions which provide a statement of reasons for their

11  denial, the Court is required to conduct an independent review of the record to determine

12  whether the state supreme court clearly erred in its application of controlling federal law

13  when it denied these claims without a statement of reasoning.

14  **B.  Analysis**

15         Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*,

16  466 U.S. 668 (1984).  "A guilty plea cannot be attacked as based on inadequate legal advice

17  unless counsel was not 'a reasonably competent attorney' and the advice was not 'within the

18  range of competence demanded of attorneys in criminal cases.'"  *Strickland*, 466 U.S. at 687.

19  To make out a claim of ineffective assistance of counsel under *Strickland*, Petitioner must

20  show (1) "that counsel's performance was deficient" and (2) "the deficient performance

21  _____

22  [2] The appellate court addressed only those aspects of Petitioner's claim involving forensic
    evidence and the failure to call Petitioner to testify, stating:

23         Even if petitioner could show her attorney should have made a more thorough
24         investigation of the forensic evidence, she has not shown that such
           investigation would have resulted in a reasonable probability of a different
25         outcome at trial.  Petitioner's expert states that forensic evidence suggests the
           victim was beaten in the bedroom, but the fatal beating took place at another
26         location.  This theory does not tend to show petitioner did not commit the
           murder.  As to her argument if this evidence had been available, she would
27         have testified, and her attorney was ineffective in not preparing her to do so,
           she has not indicated how further investigation would have encouraged her to
28         testify, informed her testimony or how the result at trial would have been
           different had she done so.

(Lodgment No. 12, *In re Dorotik*, No. D047784, slip op at 2-3.)

1    prejudiced the defense." *Id.*  The court need not address both the performance prong and the

2    prejudice prong if the petitioner fails to make a sufficient showing of either.  *See id.* at 700.

3    The *Strickland* test applies in full force in federal collateral proceedings.  *Id.* at 697.

4         The first prong of the *Strickland* test for deficiency of counsel requires a plaintiff to

5    demonstrate that counsel "made errors so serious that counsel was not functioning as the

6    'counsel' guaranteed by the Sixth Amendment."  *Strickland*, 466 U.S. at 687.  "[T]he

7    defendant must show that counsel's representation fell below an objective standard of

8    reasonableness . . . under prevailing professional norms."  *Id.* at 688.  Furthermore, judicial

9    scrutiny of counsel must be highly deferential because of the risk that the benefit of hindsight

10   would make the counsel's performance seem unreasonable.  *Id.* at 689.

11        The second prong of the *Strickland* test requires that any deficiency of counsel also be

12   prejudicial.  *Id.* at 692.  Therefore, even if a defendant is able to show that counsel acted

13   unreasonably, she still must show that counsel's actions had an adverse effect on the

14   outcome.  *Id.* at 693.  "The defendant must show that there is a reasonable probability that,

15   but for counsel's unprofessional errors, the result of the proceeding would have been

16   different."  *Id.* at 694.

17        Petitioner's argues that her Sixth Amendment right to receive effective assistance of

18   counsel was violated when defense counsel failed to: (1) subject the prosecution's forensic

19   evidence to meaningful adversarial testing and obtain readily available forensic evidence

20   which would have challenged the prosecution's theory of the case and exposed the weakness

21   of the prosecution's forensic evidence; (2) prepare and call Petitioner as a witness; (3)

22   demonstrate that Petitioner was physically incapable of committing the murder as theorized

23   by the prosecution; (4) object or move for a mistrial when a police detective testified that he

24   believed that Petitioner was the murderer; (5) obtain DNA testing on several items of

25   physical evidence; (6) present alternate scenarios consistent with the physical evidence; (7)

26   provide innocent explanations for the apparently incriminating evidence; (8) present

27   evidence that the police focused on Petitioner from the beginning of the investigation and

28   failed to follow other leads which would have led them to the real killers; (9) engage in a

   reasonably competent investigation before pursuing an absurd theory that Petitioner's

daughter was the killer; and (10) make good on promises to the jury regarding what the evidence would show, refrain from admitting to the jury that Petitioner was guilty, and refrain from stating that counsel personally did not believe in the evidence he presented at trial.  [Doc. No. 1.]  Each of Petitioner's claims will be examined in turn.

**1.  Forensic Evidence**

Petitioner argues that her attorney was deficient for failing to subject the prosecution's forensic evidence to meaningful adversarial testing and to obtain readily available forensic evidence which would have challenged the prosecution's theory of the case and exposed the weakness of the prosecution's forensic evidence.  [Doc. No. 1.]

Petitioner contends that: counsel failed to subject the prosecution's findings regarding the bedroom to comparative testing by independent experts; Charles Merritt, the prosecution expert, had made errors in other cases; the expert retained by the defense, Lisa DiMaio, failed to prepare a report analyzing the prosecution's forensic evidence; and counsel erred in not calling forensic experts to testify for the defense.  [Doc. No. 1.]

Petitioner also argues that a post-conviction report prepared by Herbert McDonnell "raise[s] serious questions as to the validity of the prosecution's theory of the case."  [Doc. No. 1.]  This report concludes that: it is more likely than not that the fatal blow to the decedent and the majority of his blood loss occurred outside of the bedroom; Merritt's findings are flawed in finding a transfer pattern rather than a splatter; there was less blood present in the bedroom than would be expected if the killing took place there; the blood found on the mattress could have resulted from a nosebleed; what were reported as blood stains could have been stains caused by rain; there was not enough blood on the mattress to support the theory that the victim remained on the bed for a period of time after being hit multiple times; the convergence of the blood spatter was below what was calculated by the prosecution's expert witness because the expert did not allow for the effect of gravity; and further testing is required regarding the area around the potbelly stove in order to determine whether the stains there are related to the murder.  [Doc. No. 1.]

Petitioner concludes that "no constitutionally competent attorney" would have accepted the prosecution's forensic evidence and theory of the case.  [Doc. No. 1.]  Instead,

counsel should have challenged this evidence and considered alternate scenarios that did not implicate Petitioner, such as the theory that farm workers killed the decedent between 1 p.m. and 4 p.m. on Sunday.  [Doc. No. 1.]

Petitioner has failed to meet *Strickland*'s two-prong standard for establishing ineffective assistance of counsel.  First, Petitioner has not shown that counsel's performance was deficient in challenging the forensic evidence presented at trial.  Petitioner contends that Lisa DiMaio, the defense expert retained by counsel, failed to prepare a report analyzing the prosecution's forensic evidence.  However, the record discloses that DiMaio prepared a report for the defense and delivered it to Petitioner's attorney on April 27, 2001, well before trial started on May 15, 2001.  (Lodgment No. 2, Reporter's Tr. ["RT"] vol. 1, 12.) Petitioner has thus failed to demonstrate that counsel failed to obtain independent forensic testing.  Petitioner also argues that her attorney should have called forensic experts to testify for the defense.  However, judicial scrutiny of counsel must be highly deferential because of the risk that the benefit of hindsight would make the counsel's performance seem unreasonable.  *Strickland*, 466 U.S. at 689.  There is a strong presumption that trial counsel made a strategic decision not to present potentially unfavorable expert forensic testimony at trial, and Petitioner has not overcome this presumption.

Second, even assuming that Petitioner could demonstrate deficient performance by trial counsel, she cannot demonstrate that counsel's deficient performance prejudiced the defense. Petitioner asserts that Charles Merritt, the prosecution expert, had made errors in other cases, and that the post-conviction forensic report prepared by Herbert MacDonnell casts doubt on the validity of the prosecution's case.  Petitioner's argument is that the outcome of her case would have been different if the jury had been presented with conclusions similar to the those found in McDonnell's report, rather than the prosecution's theory of the case.  Petitioner wishes to bolster this argument by suggesting that the prosecution's expert's work is of questionable quality.  However, her argument fails because the post-conviction report corroborates the essential elements of the prosecution's theory of the killing.  Even if the Court were to accept MacDonnell's interpretations of the forensic evidence, such interpretations would not exonerate Petitioner in any way nor point to anyone

10

other than Petitioner as the murderer.

Petitioner specifically emphasizes six findings from MacDonnell's post-conviction report.  [Doc. No. 1.]  None of them contradict the prosecution's theory of the case, that Petitioner is guilty of murdering the decedent.

**Amount of blood in the bedroom.**  The post-conviction report concludes that there was "far less blood present than would have been expected if Merritt's findings were correct."  [Doc. No. 1.]  MacDonell's report does state that the fatal blow most likely occurred outside of the bedroom.[3]  Importantly, MacDonell's report also specifically rejects scenarios in which "Robert was killed elsewhere, his body was dumped and blood evidence was planted in the master bedroom," or "Robert was killed where he was found."  [Doc. No. 1, Ex. 1.]  The report in no way questions the prosecution's theory that the decedent was attacked in the bedroom, dressed in the clothes he was found in after he had been killed or incapacitated, and dumped where the body was found.

**Blood on the mattress caused by a nosebleed.**  The post-conviction report concludes that the "blood on the mattress could have resulted from a nosebleed."  [Doc. No. 1, Ex. 1.]  However, even assuming that this explanation is correct, the report fails to address the blood splatter and cast-off blood stains on the pillows, bedspread, nightstand, walls, and window in the bedroom, which cannot be explained by the nosebleed theory.

**Blood stains actually caused by rain.**  The post-conviction report states that the bloodstain where the decedent's DNA was found, located at the foot of the staircase leading to the bedroom, could actually be a water stain that was present when Petitioner and the decedent bought the house.  [Doc. No. 17.]  But neither Petitioner nor the post-conviction report can explain why the victim's DNA was found in this location, other than to speculate that the police made a mistake.  [Doc. No. 1, Ex. 1.]  Even if the water stain existed before Petitioner moved into the house, Petitioner could have stained the same area with the

---

[3] MacDonell's report states, "Given the severity of the head wounds, why was there no brain matter or hair found in the master bedroom? . . . [It is most likely that] Robert was assaulted in the bedroom, taken to another location where he was beaten to death where most of the blood loss occurred, and then his body was dumped.  This scenario would account for the lack of the massive amounts of blood in the bedroom and at the scene where his body was found." [Doc. No. 1, Ex. 1.]

1   decedent's blood as she dragged his body down the stairs.  Furthermore, the post-conviction

2   report does not question the evidence of other blood splatter and blood cast-off stains in the

3   bedroom.  [Doc. No. 1, Ex. 2.]

4   **Amount of blood on the mattress.**  The post-conviction report states, "There was not

5   enough blood soaked into the mattress to support the hypothesis that the victim remained on

6   the bed for the period of time after the multiple hit attack described [by Merritt].  [Doc. No.

7   1, Ex. 1.]  Even assuming this conclusion is correct, the fact that the decedent did not remain

8   on the bed "for a period of time" [doc. no. 1, ex. 2] would in no way refute the blood splatter

9   and blood cast-off evidence indicating that the decedent was struck two or three times while

10  lying on the bed.

11  **Blood splatter calculation.**  The post-conviction report remarks that the prosecution

12  expert apparently did not consider the effect of gravity when calculating the height of the

13  convergence of blood splatter over the mattress, which led him to incorrectly conclude that

14  the origin of the splatter was ten to twelve inches above the mattress.  [Doc. No. 1, Ex. 1.]

15  This assertion, however, is refuted by the record.  The prosecution expert considered the

16  effect of gravity when providing his opinion.  (RT vol. 8, 1316.)  More importantly,

17  Petitioner has failed to demonstrate how a slightly different interpretation of the splatter

18  evidence would call into question the veracity of the prosecution expert's conclusions.

19  **The area around the potbelly stove.**  Based on the post-conviction report's statement

20  that the blood stains around the potbelly stove could have been caused by the decedent's

21  nosebleed [doc. no. 1, ex. 1], Petitioner asserts that further testing of this area is required to

22  determine whether the stains are related to the murder [doc. no. 1].  Even assuming that the

23  blood stains found by the stove were not associated with the murder, it would be relevant

24  only to the opinion of the prosecution expert that the decedent's body was moved to the area

25  near the potbelly stove after being hit two or three times on the bed.  It would not challenge

26  in any way the blood splatter and cast-off evidence showing that the victim was attacked in

27  the bedroom.

28  Because the area around the stove was the only area which had obviously been

cleaned by the carpet cleaner [doc. no. 1, ex. 2], Petitioner further contends that eliminating

12

the blood stains as being related to the attack would cast doubt on her guilt [doc. no. 1].
Even if the Court assumed that further testing of this area would reveal evidence favorable to
Petitioner, it would not call into question the extensive evidence showing that the victim was
attacked in the bedroom.  In any case, the evidence indicates that the victim bled heavily on
the mattress, on the carpet around the stove, and on the track of the sliding door.  Once the
bloody mattress was turned over, the carpeted area around the stove may have been the only
area that needed carpet-cleaning.

For these reasons, the Court **FINDS** that the state appellate court's conclusion, that
defense counsel's performance in dealing with the prosecution's forensic evidence was
neither deficient nor prejudicial to the defense, is a reasonable application of the *Strickland*
standard as well as reasonable determination of the facts in light of the evidence presented.

## 2.  Failure to Call Petitioner to Testify

Petitioner contends that her trial counsel's decision not to have her testify at trial was
"based on inadequate investigation and incorrect data," and that had she testified she could
have "persuasively proclaimed and demonstrated her innocence."  [Doc. No. 1.]  Petitioner
could have testified that: there were no financial difficulties between her and her husband;
they were planning a funeral for Petitioner's mother, making it absurd for her to plan a
murder at that time; her husband's blood was on the syringe found in the master bathroom
because he had assisted her in a veterinary procedure; the victim liked horses and had started
a horse-related business; Petitioner lied to the Brumbecks about her mother dying to stir their
sympathy in order to collect on a debt they owed; Petitioner and the victim were affectionate
toward each other and had no history of domestic violence; the victim had a bad nose bleed
in the bedroom, and he cleaned the mattress with the carpet shampooer before flipping it
over; Petitioner and the victim almost always cooked steaks on Saturday night and ate the
leftovers on Sunday; the victim often drove the family truck in order to measure jogging
distances; Petitioner did not go to the dumpster behind the Vons store, but went into the store
and bought toilet paper and soda; and no police officers or police dogs found any blood in the
bedroom on Sunday evening or Monday when they were in the house.  [Doc. No. 1.]

Petitioner has failed to meet *Strickland*'s two-prong standard for establishing ineffective assistance of counsel. First, Petitioner has not shown that counsel performed deficiently by opting not to call Petitioner to testify. Petitioner has not overcome the strong presumption that counsel made a strategic decision not to present Petitioner's potentially damaging testimony at trial.

Second, even assuming that Petitioner could demonstrate deficient performance by trial counsel, she has not demonstrated that counsel's deficient performance prejudiced the defense. Petitioner has failed to show that her testimony in the following areas would have affected the jury's determination of her guilt.

**Financial Difficulties.** Petitioner's testimony regarding her relationship with her husband would have added little, if anything, to the evidence already presented on that issue. The jury heard an audiotape of a statement made by Petitioner to a police officer in which Petitioner said her relationship with her husband had been "really pretty good" and had been going "pretty well" after their initial marital difficulties were resolved. (RT vol. 8, 1284; CT 345-46.) Petitioner's statement to the police, which was played for the jury, was lengthy and contained much detail regarding Petitioner's relationship with the victim. (*Id.*) Petitioner has failed to show a reasonable probability that had she testified at trial, she would have added any details regarding her and her husband's reconciliation, financial or otherwise, which would have affected the jury's verdict.

**Funeral Planning.** Petitioner contends that she was planning a funeral for her mother and that it would have been absurd for her to contemporaneously plan the murder of her husband. However, the strong evidence of Petitioner's guilt, combined with her unpersuasive attempts to cover up or explain away that evidence, suggests that the murder was not well-planned at all.

**Bloody Syringe.** Petitioner's testimony that the syringe found in the bathroom was bloody because the victim had assisted Petitioner in a veterinary procedure would not have challenged the evidence against her in any meaningful way. There were no drugs found in the victim's body other than caffeine, and there was no contention at trial that Petitioner had used the syringe to inject anything into the victim. (RT vol. 9, 1585.)

**Decedent's Horse-Related Business.**  Petitioner's testimony that the victim liked horses and had started a horse-related business would not have disproved the evidence of her motive to kill him.  Petitioner still had the incentive to prevent the decedent, who had filed for divorce, from collecting spousal support in the future.

**Petitioner's Lie to the Brumbecks.**  Petitioner claims that she lied to the Brumbecks about her mother dying to stir their sympathies and motivate them to pay a debt.  This testimony would not have rehabilitated Petitioner's credibility in the eyes of the jury; rather, it indicates that she was dishonest.

**Petitioner and Decedent's Relationship.**  Petitioner's testimony that she and the victim were affectionate would only have contradicted extensive evidence to the contrary, and not very credibly.

**Decedent's Nosebleed.**  Petitioner's testimony that the victim had a bad nose bleed in the bedroom which he cleaned with the carpet shampooer, and that Petitioner told him to flip the mattress after he stained it, would have been duplicative of her son's testimony that Petitioner had explained the presence of blood in the bedroom by saying the victim had a nosebleed.  (RT vol. 10, 1785.)  A detective also testified that Petitioner had explained the presence of blood in the bedroom by saying that the victim had a nosebleed.  (RT vol. 8, 1195.)

Moreover, Petitioner's testimony that the blood in the bedroom was from a nosebleed, even if it could explain the large volume blood stain on the underside of the mattress, would have been in stark contrast to the other blood evidence.  This evidence included impact blood spatter on the bed, wall, window, headboard, nightstand, telephone, picture, and lamp, as well as cast off blood stains on the wall and ceiling.  (*Id.* at 1196-1204, 1308-1334.)  There was also evidence that the victim bled so much while lying on the track of the sliding door that the blood dripped down into the room directly under the bedroom, as well as evidence of a transfer blood stain on the exterior wall adjacent to the stairs leading down from the patio outside the bedroom.  (*Id.* at 1354-56.)  None of this evidence could be explained by a nosebleed.

**Petitioner and Decedent's Meal Habits.**  Petitioner could have testified that she and

the victim almost always cooked steaks on Saturday night and ate the leftovers on Sunday, and that it would have explained the contents of the victim's stomach. However, such testimony would not have accounted for the contents of the victim's stomach other than the steak, which included green leafy vegetable matter, potatoes, beans, and peppers or tomatoes. (RT vol. 9, 1584.) Even if Petitioner had testified that her husband had eaten essentially a full dinner in the early afternoon immediately before going jogging, it probably would not have altered the jury's verdict. The jury heard evidence indicating the victim did not go jogging on Sunday afternoon, but rather had been killed or incapacitated within two hours of eating dinner on Saturday night and was later dressed in his jogging clothes.

There was also testimony that Petitioner told a detective that she could not remember what the victim had eaten on Sunday, but speculated that he had eaten cereal. (RT vol. 8, 1286, 1294.)

**The Family Truck.** Petitioner claims that the victim often drove the family truck in order to measure jogging distances, which could have accounted for the tire tracks found near his body. Even if this explanation was true, it would not explain why the Petitioner's truck had backed up to where the body was found, why the grass was bent down as if something had been dragged from the bed of the pickup truck to where the body was found, or why two sets of muddy footprints were found leading from the truck to the body. (*Id.* at 1174-78; RT vol. 11, 2034-43.)

**Petitioner's Actions the Day Decedent's Body was Found.** Petitioner could have testified that she did not go to the dumpster behind the Vons store, and that she bought toilet paper and soda at the store, but there is no indication that this testimony would have impacted the jury's verdict. An acquaintance of Petitioner testified that he saw Petitioner driving her pickup truck near a Vons store at about 6:45 p.m. on Sunday, and that it appeared odd that Petitioner turned and headed towards the dumpsters in the back of the store, which was an area not normally used to park to shop at Vons, rather than proceed straight into the Vons parking lot. (RT vol. 8, 1429-32; RT vol. 9, 1457-58.)

Petitioner contends that had she testified on this matter, she could have rebutted an implication raised by the prosecution that she used her pickup truck to dump the body

07cv1007 J (POR)

sometime that evening and then disposed of evidence in the dumpsters.  However, nothing related to the homicide was found in the dumpsters behind the Vons store.[4/]  The jury also heard Petitioner say during the recorded interview that she "ran in, picked up something at the store" while she was out looking for her husband that evening (RT vol. 8, 1284; CT 333), and saw the Vons receipt that Petitioner had purchased something at the store costing $1.01 at 6:58 p.m. on Sunday (RT vol. 13, 2378-79).

**Investigation of the Bedroom.**  Finally, Petitioner could have testified that no police officers or police dogs found any blood in the bedroom when they were in the house on Sunday evening and Monday.  The police were in the house on Sunday in response to Petitioner's report of a missing person, and there would have been no basis at that time for them to conduct a thorough examination of the entire house looking for signs of foul play. The blood evidence was found when forensic experts examined the house after the police concluded that the victim had been murdered rather than having suffered an accidental death while out jogging, as they had been led to believe by Petitioner.  There is no reasonable probability that evidence of a delay in finding the blood evidence in the bedroom would have affected the outcome of the trial.

For these reasons, the Court **FINDS** that the state appellate court's conclusion, that defense counsel's decision to not call Petitioner to testify did not constitute deficient performance or cause prejudice to the defense, is a reasonable application of the *Strickland* standard.

### 3.  Petitioner's Physical Abilities

Petitioner contends that defense counsel was deficient for failing to demonstrate that she was physically incapable of committing the murder as theorized by the prosecution. [Doc. No. 1.]  Specifically, she claims that she has a well-documented fractured hip repaired with metal pins and a severely arthritic back.  She argues that trial counsel could have retained an expert witness to establish that she lacked the physical strength necessary to carry a body across a sixty-foot porch, down a flight of stairs, load it into a truck and dump it, all

---

[4] The dumpsters had been emptied on Monday, the day after the decedent's body was found, and were not searched until four or five days later.  (RT vol. 13, 2378, 2380-81.)

1    without leaving a trace of evidence on the porch or on her clothes.  [Doc. No. 1.]

2        Based on an independent review of the record,[5] Petitioner has failed to establish either

3    deficient counsel performance or prejudice to her defense and therefore has not met

4    *Strickland*'s standard for establishing ineffective assistance of counsel.

5        First, Petitioner cannot establish deficient counsel performance.  Her contention that

6    counsel did not consult an expert regarding Petitioner's physical abilities is incorrect.

7    Defense counsel retained Dr. William Curran to examine Petitioner on May 2, 2001, well

8    before trial began on May 15, 2001, and provided Dr. Curran with Petitioner's medical

9    records regarding her past injuries and surgeries.  (RT vol. 1, 9-11.)  Petitioner's counsel

10   informed the court that he would not decide whether to call Dr. Curran as a trial witness until

11   after the examination.  (*Id.*)  Two days later, on May 3, 2001, Petitioner's counsel informed

12   the court that he had heard from Dr. Curran, that his co-counsel had "spent a considerable

13   amount of time with him on the phone," and that trial counsel had "taken that information

14   and discussed it with my client this morning."  (RT vol. 3, 324.)  Thus, Petitioner's

15   contention that trial counsel was deficient because he failed to obtain an expert opinion as to

16   her physical abilities is without merit.

17       Second, Petitioner is unable to demonstrate prejudice.  Even if defense counsel has

18   presented evidence that Petitioner was physically unable to commit the murder as theorized

19   by the prosecution, the jury would have heard voluminous evidence to the contrary.

20   Alexander, Petitioner's son, testified that Petitioner shattered her hip in an automobile

21   accident in 1983 or 1984, but that in 1993 or 1994 he observed her moving twenty- or forty-

22   foot long irrigation metal pipes, and that she moved "a lot of relatively heavy things" in

23   connection to the horse ranch.  (RT vol. 10, 1789.)  Petitioner's son Nicholas testified that

24   after Petitioner recovered from her automobile accident, she did work around the ranch "that

25   was pretty strenuous and pretty physical," including moving heavy irrigation pipes which

26   were about fifty feet long and weighed between fifty and seventy-five pounds.  (*Id.* at

27

28

---

[5] As set forth above, the Court will conduct an independent review of the record with respect to this and the remaining seven aspects of Petitioner's ineffective assistance of counsel claim. *See supra* Part I.A.

07cv1007 J (POR)

1819-20, 1836.)  Testimony at trial indicated that the victim weighed 147 pounds at the time

of death.  Evidence indicated that a slide of some type was used to move the body from the

bed of the pickup truck through the grass to where it was found, and it is not unreasonable to

believe that a woman who is physically capable of moving seventy-five-pound pipes could

also move a 147-pound body with the assistance of a slide.  (RT vol. 8, 1174-75; RT vol. 9,

1571.)

Based on an independent review of the record, the Court **FINDS** that the state

supreme court did not err in its application of the *Strickland* standard.  Petitioner has not

established that counsel failed to consult an expert regarding her physical abilities, nor has

Petitioner shown the expert retained by counsel would have testified that she was physically

incapable of moving her husband's body.  Even assuming that an expert could have provided

such an opinion, there is no reasonable probability that the jury would have deferred to the

expert's opinion over the evidence presented at trial, including the testimony of eyewitnesses

regarding Petitioner's actual physical abilities.

### 4. Police Detective's Testimony

Petitioner contends counsel failed to object or move for a mistrial when Police

Detective Richard Empson testified that he did not bother to obtain DNA testing of the rope

used to strangle the victim, or the victim's shoelaces, because he believed that Petitioner was

guilty.  [Doc. No. 1.]

At trial, Detective Empson testified about the rope found on the decedent and similar

rope found at the home.  Defense counsel asked if the rope found on the victim's body had

been tested for DNA.  (RT vol. 8, 1246.)  Empson testified that criminologists in his office

discouraged testing because too many people could have handled the rope.  (*Id.* at 1265.)

Later, counsel again questioned Empson about the decision not to test the rope and some

other materials.  (RT vol. 12, 2126.)  Shortly afterward, defense counsel pressed him on

testing the rope, asking, "And then if you were to recover DNA on that rope from Claire

Dorotik or from Leonel Morales, [that] might give you better insight as to who actually killed

Bob Dorotik, don't you think?"  Empson responded, "I believe I know who killed Mr.

Dorotik."  (*Id.* at 2190.)  He continued, "That's why I arrested Jane Dorotik."  (*Id.* at 2191.)

Based on an independent review of the record, Petitioner has failed to establish either deficient counsel performance or prejudice to her defense and therefore has not met *Strickland*'s  standard for establishing ineffective assistance of counsel.

First, Petitioner cannot establish deficient counsel performance.  Although it was improper for the detective to give his personal opinion regarding Petitioner's guilt, clearly defense counsel was attempting to demonstrate that the police investigation was sloppy or incomplete because the lead detective had made up his mind who the killer was and had then ignored or failed to follow up on evidence which might have pointed to a suspect other than Petitioner.  Petitioner has therefore failed to overcome the presumption that defense counsel had a tactical reason for prompting the detective to admit he did not pursue DNA testing on the rope because he had already decided Petitioner was guilty.  Furthermore, Petitioner has not shown a reasonable probability that a defense motion for a mistrial would have been granted had one been requested.

Second, Petitioner is unable to demonstrate prejudice.  The case against Petitioner was based primarily on circumstantial and forensic evidence.  In reality, it was beneficial to the defense for the jury to hear that the lead detective did not test one of the murder weapons because he had already decided who the killer was.

Based on an independent review of the record, the Court **FINDS** that the state supreme court did not err in its application of the *Strickland* standard.  Petitioner has failed to demonstrate that she received constitutionally ineffective assistance of counsel based on defense counsel's failure to object or request a mistrial when Detective Empson testified that he believed Petitioner was the murderer.

## 5. DNA Testing

Petitioner contends that defense counsel failed to obtain DNA testing of the rope,[6]

---

[6] In her Traverse, Petitioner contends that the rope was not tested only because of her inability to afford the cost of the testing, resulting in a denial of her Fifth and Fourteenth Amendment rights to due process and equal protection.  [Doc. No. 17.] This claim was not presented in the Petition and is presented in the Traverse in direct violation of this Court's Order directing a response to the Petition, wherein Petitioner was instructed, "Any traverse by Petitioner (a) shall state whether Petitioner admits or denies each allegation of fact contained in the answer; (b) shall be limited to facts or arguments responsive to matters raised in the answer; and (c)

(continued...)

fingernail scrapings from the victim, fingerprints on the truck, blood on a towel found in the bedroom which was determined to belong to someone other than Petitioner or the victim, fingernail scrapings of farm workers Morales and Armando, black flecks of material found in the victim's scalp, and the area in and around the potbelly stove.  [Doc. No. 1.]

Petitioner has failed to establish either deficient counsel performance or prejudice to her defense and therefore has not met *Strickland*'s standard for establishing ineffective assistance of counsel.  Petitioner cannot establish deficient counsel performance because she has failed to overcome the presumption that counsel made a tactical decision not to seek DNA testing.  Given the evidence of Petitioner's guilt, it was reasonable for counsel to believe that if DNA from a source other than the victim was found in these areas, it would likely belong to Petitioner.  Even if DNA belonging to someone other than Petitioner or the victim was found on these areas, it would at best point to an accomplice but would not call into question the evidence implicating Petitioner in the initial attack.

Petitioner is also unable to demonstrate prejudice.  Petitioner has failed to demonstrate how it would have been helpful to the defense case, other than pure speculation regarding possible results, to conduct testing of these areas.  Speculative allegations are insufficient to prove that counsel provided ineffective assistance.  *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994); *Blackledge v. Allison*, 431 U.S. 63, 74 (1977); *see also Simmons v. Gramley*, 915 F.2d 1128, 1134 (7th Cir. 1990) ("[C]ursory allegations that are purely speculative cannot support a claim of lack of competence of counsel.").

Based on an independent review of the record, the Court **FINDS** that the state supreme court correctly held that counsel's decision not to obtain further DNA testing did not amount to constitutionally ineffective assistance of counsel.

## 6. Alternate Scenarios

Petitioner contends that defense counsel failed to present the jury with alternate

_____

(...continued)
shall not raise new grounds for relief that were not asserted in the Petition." [Doc. No. 7.] The claim is therefore not properly before the Court. *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) (noting that a court may ignore issue raised for first time in traverse when scope of traverse has been specifically limited by court order and petitioner ignores order to file a separate pleading indicating intent to raise claim).

07cv1007 J (POR)

scenarios, consistent with the physical evidence, that did not implicate Petitioner.  [Doc. No. 1.]  This contention appears to be unsubstantiated.  At trial, defense counsel argued that a farm worker named Leonel Morales could have the killed victim.  Lisa Marie Singh testified for the defense that she drove by the area where the decedent's body was found at 4:00 p.m. or 5:00 p.m. on Sunday and saw two possibly Hispanic men and the victim sitting in a black pickup truck.  (RT vol. 13, 2318-19.)  Counsel then presented evidence that one tire mark found near the body could have been made by Morales's truck.  (RT vol. 11, 2046-47.) Defense counsel also cross-examined the prosecution's expert on the victim's head wounds, who admitted that the wounds could have been made with a drywall hammer, and defense counsel noted that Morales worked with drywall. (*Id.* at 1912.)

Obviously the jury rejected the defense theory that Morales murdered the victim. However, Petitioner's contention that defense counsel was deficient for failing to present such a scenario to the jury for their consideration is not supported by the record. Accordingly, based on an independent review of the record, the Court **FINDS** that the state supreme court did not err in its application of the *Strickland* standard.  Petitioner cannot demonstrate that defense counsel failed to provide alternate scenarios of the victim's murder that did not implicate Petitioner.

**7.  Innocent Explanations**

Petitioner contends counsel was deficient for failing to provide innocent explanations for the apparently incriminating evidence presented by the prosecution.  [Doc. No. 1.] Specifically, she opines that: the blood found on the mattress could have come from a nosebleed; the tire tracks found near the victim's body could have been made when the victim measured the distance for his jog, as was his custom: the victim's blood found on the truck was minute and could have been deposited in the course of his work on the ranch; the victim's body and his jogging jacket were found along his usual jogging route, and two witnesses saw him out late Sunday afternoon in the area where the body was found on Monday morning; her fingerprint in the victim's blood on the syringe found in the bathroom could have resulted from the victim assisting Petitioner with a medical procedure on a horse, which could have been verified by medical records and syringes kept in the house and barn

1   in connection to the horse business; there was nothing found in the dumpsters behind the

2   Vons store, and the testimony that Petitioner was seen driving in the direction of the

3   dumpsters was consistent with her shopping at the store; and the type of rope used to strangle

4   the victim was commonly found in the Dorotik household, and Petitioner was knitting a dog

5   bed with the rope.  [Doc. No. 1.]

6          Petitioner has not shown that counsel performed deficiently by failing to provide an

7   innocent explanation for every piece of evidence that implicated Petitioner.  Counsel's

8   responsibility was not to raise every argument, however implausible, that might tend to

9   exculpate Petitioner.  *See Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985) ("Failure to

10  raise a meritless argument does not constitute ineffective assistance.").  Counsel only

11  presented explanations that were more likely to persuade the jury of Petitioner's innocence.

12  At trial, counsel presented evidence that the blood found on the mattress could have come

13  from decedent's nosebleed.  Counsel also presented the testimony of Lisa Marie Singh, who

14  said she saw the victim in the company of two men in a black pickup truck on Sunday

15  afternoon near where his body was found.  Defense counsel's performance was therefore not

16  deficient for failing to present innocent explanations to the jury.  Rather, counsel presented

17  these theories to the jury, and the jury rejected them because they were inconsistent with the

18  more persuasive evidence that Petitioner killed the victim.

19         Based on an independent review of the record, the Court **FINDS** that the state

20  supreme court did not err in its application of the *Strickland* standard.  Counsel's decision not

21  to provide innocent explanations to counter every piece of incriminating evidence did not

22  constitute deficient performance.

23  **8. Police Investigation**

24         Petitioner contends that counsel was deficient for failing to present evidence that the

25  police focused on Petitioner from the beginning of the investigation and failed to follow

26  other leads which would have led them to the real killers.  [Doc. No. 1.]  Specifically, she

27  states that: Detective Empson admitted in court that he did not order testing of the rope or

28  shoelaces because he had already concluded that Petitioner was guilty; Lisa Marie Singh told

Detective Ryzdynski that she saw the victim in a black truck with two males a few feet from

where the body was found, but that Singh was not contacted by the Sheriff's Department until fifteen months later and told at that time that she had been mistaken because Petitioner was the killer; and the jury was not permitted to hear that Sherry Newton saw the victim jogging about an hour before Singh saw him, and that Newton reported seeing a black truck in the vicinity being driven by two males. [Doc. No. 1.]

Petitioner has not met *Strickland*'s standard for establishing ineffective assistance of counsel. First, Petitioner cannot establish that counsel performed deficiently. Petitioner's first assertion, that counsel failed to present evidence relating to Detective Empson, is unsupported by the record. Counsel cross-examined Detective Empson regarding his decision not to conduct DNA testing on the rope because he had already decided Petitioner was guilty.

Petitioner next contends that defense counsel's performance was deficient because the court did not permit the jury to hear Sherry Newton's testimony. The Court is not persuaded that counsel's performance regarding Newton's testimony was deficient. Newton did not contact defense counsel until after closing arguments had been presented. As soon as counsel learned of Newton's statement, he vigorously pursued a motion to reopen the defense case. [Doc. No. 1, Ex. 10.] Counsel also stated that Newton had given a statement to the police within one week of the murder, and the failure to disclose the statement was a violation of their duty to disclose under *Brady*. (*Id.*) Notwithstanding counsel's efforts, the trial court found that Newton lacked credibility[7] and did not allow her to testify.

Second, even if Petitioner could show deficient performance, she cannot establish prejudice. Petitioner alleges that Lisa Marie Singh was not contacted by the detectives until

---

[7] The trial court found that there was no credible evidence that Newton gave a statement to the police at or near the time the body was discovered. Newton testified at the new trial motion that the man she saw jogging was wearing different clothes than those found on the victim. (RT vol. 14, 2784.) The truck she saw had a black and gold license plate, whereas Morales' truck was registered fourteen years after the DMV stopped issuing black and gold license plates. (*Id.* at 2767; RT vol. 15, 3006-07.) Newton described the jogger she saw as between six feet, three inches and six feet, five inches tall, weighing between 220 and 240 pounds, whereas evidence at trial indicated the victim was five feet, eight and one-half inches tall, and weighed 147 pounds. (RT vol. 14, 2784, 2805.) Newton also testified that it was sunny and warm when she saw the jogger, whereas testimony at trial indicated it was cold and rainy on Sunday when Petitioner reported her husband missing after going jogging. (*Id.* at 2792.)

fifteen months after the murder, and that when Singh was contacted the police told her that Petitioner was the killer. However, even assuming that these events occurred as Petitioner alleges, Petitioner does not explain how these events prejudiced her defense. Singh testified at trial, and Petitioner has come forward with no evidence that the prosecution or the police made any attempt to dissuade her from testifying. Furthermore, Singh testified at trial consistently with her statement she gave to the police the day after the body was found, and Petitioner has not shown that there would have been any effect on the jury's verdict had they heard that Singh was told by the police that she was mistaken or that her testimony was unnecessary since they knew who the killer was.

Based on an independent review of the record, the Court **FINDS** that the state supreme court did not err in its application of *Strickland*. Counsel's presentation of evidence at trial regarding the police investigation of decedent's murder was not constitutionally ineffective.

**9. Pre-Trial Investigation**

Petitioner contends that her trial counsel should have engaged in a reasonably competent pre-trial investigation before pursuing the absurd theory that her daughter Claire murdered the victim. [Doc. No. 1.] She contends that defense counsel was responsible for her conviction because he implied that she covered up evidence of the killing in order to protect her daughter from being convicted of murder. [Doc. No. 17.]

Petitioner has failed to meet *Strickland*'s standard for establishing ineffective assistance of counsel because she cannot establish deficient counsel performance. Defense counsel introduced evidence of two sets of footprints found near decedent's body. Claire, a likely suspect in helping Petitioner dump the body, invoked her Fifth Amendment privilege and did not testify at Petitioner's trial. Defense counsel was therefore in the difficult position of attempting to present evidence suggesting that more than one person participated in dumping the body, while at the same time offering an alternate explanation as to how Petitioner was not aware that the victim had been attacked in the bedroom they shared and that significant cleanup had taken place in the bedroom. Given the evidence that counsel had to explain, his strategic decision to implicate Claire in the murder does not constitute

1  deficient performance.

2      Based on an independent review of the record, the Court **FINDS** that the state

3  supreme court correctly held that counsel's decision to implicate Claire did not amount to

4  constitutionally ineffective assistance of counsel.

5  **10.  Counsel's Statements**

6      Petitioner contends that trial counsel: made promises to the jury in his opening

7  statement regarding evidence they would see which he did not keep; admitted that he did not

8  believe in the evidence presented at trial; and told the jury during closing argument that

9  Petitioner was guilty.  [Doc. Nos. 1, 17.]  The Court **FINDS** that none of these statements

10  constitutes deficient performance under *Strickland*.

11      **Counsel's Opening Statement.**  In his opening statement, trial counsel predicted the

12  evidence would establish that the victim did not like women, he had a difficult relationship

13  with his daughter Claire, and Claire was not in Long Beach over the weekend the murder

14  took place as she had contended, all in an effort to suggest Claire was the killer.  [Doc. No.

15  11.]  However, evidence supporting the theory that Claire was the killer was not presented at

16  trial as promised.

17      Petitioner has failed to meet *Strickland*'s standard for establishing ineffective

18  assistance of counsel because she cannot establish prejudice to the defense.  The judge

19  instructed the jury that they "must base [their] decision on the facts and the law," that "if

20  anything concerning the law said by the attorneys in their arguments or at any other time

21  during the trial conflicts with my instruction on the law, you must follow my instructions,"

22  and that "statements made by the attorneys during the trial are not evidence."  (CT 272, 274.)

23  "The Court presumes that jurors, conscious of the gravity of their task, attend closely the

24  particular language of the trial court's instructions in a criminal case and strive to understand,

25  make sense of, and follow the instructions given them." *Francis v. Franklin*, 471 U.S. 307,

26  324 n.9 (1985).  Petitioner has not established that the jury did not follow the judge's

27  instructions to base their verdict on the law and evidence, rather than statements by counsel.

28      **Counsel's Belief in Petitioner's Guilt.**  Petitioner contends counsel stated that he did

not personally believe the evidence he presented at trial, and that such an admission is a

direct violation of counsel's constitutional duty to present a vigorous defense.  [Doc. No. 1.]

Petitioner does not explain where or when counsel made such a statement.  However, assuming Petitioner is referring to the following passage from closing argument, it is clear that defense counsel's comment did not communicate a disbelief of the evidence to the jury.  Defense counsel stated:

> Did Jane Dorotik carry the body over her shoulder, 150 pounds? . . . Jane has a crushed hip and there are pins in it.  Could she lift 150 pounds?  You know, honestly, I don't know.  I don't know.  Her son said, "Oh, she can probably lift 100, 150 pounds."  So I'm thinking in my mind how and you–how can you believe she's lifting 150 pounds?  Then it occurred to me, hey, if she's lifting 150 pounds by herself like the prosecution wants you to believe, you're going to see significantly depressed footprints.  Instead of 150, 120, 140, whatever, you're going to see twice the indentation, the depth of those footprints.  You don't see it because there are two pathways, because two people dropped that body of Robert Dorotik's.  That's why you don't see it, ladies and gentlemen.

(RT vol. 13, 2500-01.)

Taken in context, the remark does not convey a disbelief in the evidence presented at trial.  Rather, counsel was making alternative arguments to the jury: either Petitioner was not physically strong enough to lift and carry her husband's body, or she could not have done so because the footprints found near the body would have been much deeper.  Defense counsel's comment did not constitute deficient performance, and there was no prejudice to the defense.

**Counsel's Closing Argument.**  Petitioner contends that trial counsel admitted her guilt during closing argument when he argued that the jury should not vote for Petitioner's guilt if it believed "more than Jane," i.e. someone other than Petitioner, was involved in the murder.  [Doc. No. 17.]

Petitioner has failed to show deficient performance or prejudice from this remark.  Taken in context, defense counsel did not convey to the jury that he believed Petitioner was guilty.  The remark expressed the opinion that if the jury believed that more than one person was involved in decedent's murder, as the evidence indicated, Petitioner could not be guilty under the prosecution's theory.

Based on an independent review of the record, the Court **FINDS** that the state supreme court did not err in its application of *Strickland.*  None of counsel's statements

27

1   discussed in this section constitutes ineffective assistance of counsel.

2       For the above reasons, this Court **DENIES** Petitioner's writ of habeas corpus based on

3   her claims that she received ineffective assistance of counsel.

4   **II. Petitioner's Brady Claim**

5       The due process clause requires the prosecution to disclose to the defense any

6   evidence that is material either to guilt or to punishment. *Pennsylvania v. Ritchie*, 480 U.S.

7   39, 57 (1987); *United States v. Bagley*, 473 U.S. 667, 674 (1985); *United States v.*

8   *Valenzuela-Bernal*, 458 U.S. 858, 873 (1982); *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

9   Evidence is material "if there is a reasonable probability that, had the evidence been

10  disclosed to the defense, the result of the proceeding would have been different." *Kyles v.*

11  *Whitley*, 514 U.S. 419, 433 (1995) (quoting *United States v. Bagley*, 473 U.S. at 682 (opinion

12  of Blackmun, J.)); *Pennsylvania v. Ritchie*, 480 U.S. at 57; *see also United States v.*

13  *Valenzuela-Bernal*, 458 U.S. at 868. "A 'reasonable probability' of a different result is . . .

14  shown when the government's evidentiary suppression 'undermines confidence in the

15  outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. at 434 (quoting *United States v. Bagley*,

16  473 U.S. at 678).

17      Petitioner contends that her rights under the Fifth and Fourteenth Amendments, as

18  those rights are interpreted in *Brady*, 373 U.S. at 87, were violated when the prosecution: (1)

19  withheld information regarding witness Singh which was favorable to the defense; (2) failed

20  to notify the defense of evidence that the prosecution's forensic expert, Charles Merritt, had

21  made errors in other cases and had employed faulty methodology; (3) denied Petitioner's

22  motion for a new trial, which resulted in excluding from the jury the testimony of witness

23  Newton; and (4) failed to subject evidence to testing.  [Doc. No. 1.]

24  **A. Analysis of Petitioner's First and Third *Brady* Claims**

25      Petitioner raised these *Brady* claims in her state habeas corpus challenges.  However,

26  she did not raise these claims on direct appeal in state court. (Lodgment 3.)  On habeas

27  review, the trial court and appellate court denied Petitioner's first and third *Brady* claims on

28  the following procedural ground: the law in California provides that errors that could have

been raised on direct appeal, but were not, may not be presented in a petition for writ of

habeas corpus.[8/]  (Lodgment 7 at 2.)  *See In re Clark*, 5 Cal. 4th 750, 766-67 (Cal. 1993); *Ex parte Dixon*, 41 Cal. 2d 756, 759 (Cal. 1953) ("[T]he writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction.").

The Court **FINDS** that this adequate and independent state procedural rule bars this Court from addressing the merits of Petitioner's first and third *Brady* claims.  Adequate and independent state procedural rules will bar a claim for federal habeas corpus relief unless the petitioner can demonstrate cause and prejudice to excuse the default, or otherwise show that a fundamental miscarriage of justice would result from the court's refusal to hear her claim. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991), *Sawyer v. Whitley*, 505 U.S. 333 (1992); *Bennett v. Mueller*, 322 F.3d 573, 580-83 (9th Cir. 2003).

The Court **FINDS** that the state procedural rule at issue is adequate and independent of federal law.  "A state procedural rule constitutes an adequate bar to federal habeas review if it was 'firmly established and regularly followed' at the time it was applied by the state court."  *Poland v. Stewart*, 169 F.3d 573, 585 (9th Cir. 1999), quoting *Ford v. Georgia*, 498 U.S. 411, 424 (1991).  The rule here is adequate because it was firmly established and regularly followed at the time it was applied in state court.  In *Calderon v. U.S. District Court*, 103 F.3d 72 (9th Cir. 1996), the Ninth Circuit observed that in *In re Harris*, 5 Cal.4th 813 (1993), "The California Supreme Court . . . reaffirmed the rule's continued vitality and narrowed the available exceptions to the rule [barring habeas review of claims not raised on direct appeal]."  *Calderon*, 103 F.3d. at 75 (citations omitted).

The procedural rule barring habeas review of claims not raised on direct appeal is also independent of federal law.  A state procedural rule is "independent" if it is not interwoven with federal law.  *LaCrosse v. Kernan*, 244 F.3d 702, 704 (9th Cir. 2001).  The Ninth Circuit has held that, for cases in which the petitioner's default occurred after the California Supreme Court announced *In re Robbins*, 18 Cal.4th 770 (Cal. 1998), the procedural rule is

---

[8] Because the state supreme court denied the claim summarily, the Court will look through the supreme court's silent denial to the decisions of the appellate court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

1  independent of federal law.  *Bennett v. Mueller*, 322 F.3d at 581-82.  Petitioner's default

2  occurred, at the earliest, when Petitioner failed to present her *Brady* claim on direct appeal

3  when she filed her opening brief on November 13, 2002.  Because Petitioner's default

4  occurred after the California Supreme Court announced *In re Robbins*, the state procedural

5  rule is independent of federal law.

6         The Court **FINDS** next that Petitioner has not established cause or prejudice to excuse

7  the default.  The cause prong can be satisfied if Petitioner demonstrates some "objective

8  factor" that precluded her from raising her claims in state court, such as interference by state

9  officials or constitutionally ineffective counsel.  *McCleskey v. Zant*, 499 U.S. 467, 493-94

10  (1991).  In the habeas petition filed in the state supreme court, Petitioner contended that the

11  *Brady* claims presented had not been raised on direct appeal due to ineffective assistance of

12  counsel.  (Lodgment No. 13 at 5.)  However, the Supreme Court has explained the severity of

13  counsel ineffectiveness needed to excuse a procedural default: "Not just any deficiency in

14  counsel's performance will do, however; the assistance must have been so ineffective as to

15  violate the Federal Constitution."  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).

16  Petitioner has failed to establish this degree of deficient counsel performance and is therefore

17  unable to demonstrate cause sufficient to excuse her default.

18         Additionally, Petitioner cannot establish prejudice.  To establish the prejudice

19  necessary to overcome a procedural default, Petitioner must show "not merely that the errors

20  at [her] trial created a possibility of prejudice, but that they worked to [her] actual and

21  substantial disadvantage, infecting [her] entire trial with error of constitutional dimensions."

22  *See United States v. Frady*, 456 U.S. 152, 170 (1982).  In order to prove a *Brady* violation, a

23  petitioner must show that: "(1) the evidence was exculpatory or impeaching; (2) it should

24  have been, but was not produced; and (3) the suppressed evidence was material to [her] guilt

25  or punishment."  *Paradis v. Arave*, 130 F.3d 385, 392 (9th Cir. 1997).  Evidence is material

26  "if there is a reasonable probability that, had the evidence been disclosed to the defense, the

27  result of the proceeding would have been different."  *Kyles v. Whitley*, 514 U.S. 419, 433-34

28  (1995).

       Petitioner alleges in her first *Brady* claim that the prosecution withheld information

regarding defense witness Singh.  Assuming arguendo that this is true, Petitioner cannot show how the prosecution's actions prejudiced her defense.  Petitioner argues that because the substance of Singh's testimony was discovered late in the case, the defense was prevented from discovering witnesses Clyde Walton and Hans Woidtke.  Walton would have testified that he recalled seeing a man jogging about nine miles from where the body was found, who generally fit the victim's physical description, and whom he had seen several times in the past jogging with a female, but did not remember what day he had seen the jogger.  (RT vol. 15, 2955-58.)  Woidtke would have testified that he lived in the area where the body was found, that on the day the body was found he went to the Rancho Market—the same market Newton said she had visited on the day she saw the victim jogging—and learned from the butcher that two Hispanic men who work down the road told the butcher that they saw two other Hispanic males, on an unstated day, driving a dark pickup truck with a white male who looked like he was asleep sitting between them.  (*Id.* at 2959-61.) However, these statements would not in any sense have contradicted the strong evidence tying Petitioner to the murder and probably would not have affected the jury's decision. Petitioner cannot establish prejudice in her first *Brady* claim.

Regarding Petitioner's third *Brady* claim, Petitioner has failed to demonstrate how the result of her trial would have been different if witness Newton had testified.  As the trial judge noted, Newton's statement obviously involved a different jogger who was wearing different clothes than the victim, was much taller and much bigger than the victim, and was out jogging on a warm sunny day.  Such evidence would not have had any effect on the jury's determination regarding Petitioner's guilt.

For the reasons states above, the Court **FINDS** that Petitioner has not established cause or prejudice to excuse the default of her first and third *Brady* claims.

Finally, the Court **FINDS** that Petitioner has not demonstrated that the Court's failure to reach the merits of her claim would result in a fundamental miscarriage of justice.  The Supreme Court has limited the "miscarriage of justice" exception to habeas petitioners who can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995).  "Actual innocence" means

31

1    factual innocence, not merely legal insufficiency; a mere showing of reasonable doubt is not

2    enough.  *See Wood v. Hall*, 130 F.3d 373, 379 (9th Cir. 1997).

3        To establish actual innocence, Petitioner must show that it is more likely than not that

4    no reasonable juror would have found her guilty beyond a reasonable doubt.  *Id.*  Petitioner

5    has failed to carry this burden.  The evidence that Petitioner alleges was withheld by the

6    prosecution does not exonerate Petitioner; it does not call into question her involvement in

7    the victim's murder.  Petitioner has failed to demonstrate that a fundamental miscarriage of

8    justice would arise from the Court's failure to reach the merits of her *Brady* claims.

9    **B. Analysis of Petitioner's Second *Brady* Claim**

10       Petitioner contends in her second *Brady* claim that the prosecution failed to notify the

11   defense of evidence that the prosecution's expert, Charles Merritt, had made errors in other

12   cases and had employed faulty methodology.  [Doc. No. 1.]  This aspect of claim two was

13   presented to the state supreme and appellate courts in the same manner as it is presented here.

14   (Lodgment No. 13 at 32; Lodgment No. 11 at 22.)  The state supreme court issued a silent

15   denial of the petition in which this aspect of claim two was presented, and the appellate court

16   denied the petition without addressing this aspect of claim two.  Because there is no reasoned

17   decision from the state courts with respect to this aspect of claim two, the Court must

18   conduct an independent review of this claim.  *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th

19   Cir. 2002).

20       The Court **FINDS** that the prosecution's handling of evidence regarding Merritt does

21   not constitute a *Brady* violation because Petitioner cannot show how this evidence would

22   have been material to her guilt or punishment.  She has not shown that challenging Merritt's

23   competence would have diminished in any way the impact on the jury of the forensic

24   evidence, particularly in light of the fact that the defense consulted its own forensic expert

25   prior to trial.   Petitioner does not establish "a reasonable probability that, had the evidence

26   been disclosed to the defense, the result of the proceeding would have been different."

27   *Kyles*, 514 U.S. at 433-34.

28   **C. Analysis of Petitioner's Fourth *Brady* Claim**

        Petitioner contends in her fourth *Brady* claim "that the prosecution purposely failed to

1    do testing which would have cast doubt on the prosecution's theory of the case, and the

2    prosecution failed to provide DNA testing which would have tended to exonerate Petitioner."

3    [Doc. No. 1.]  This aspect of claim two was presented to the state supreme and superior

4    courts in the same manner as it is presented here.  (Lodgment No. 13 at 34; Lodgment No. 9

5    at 4.)  The supreme court issued a silent denial of the petition, while the superior court

6    addressed this aspect of claim two on the merits.  The last reasoned decision addressing this

7    claim is therefore the superior court order denying the habeas petition.  The superior court

8    stated:

9           Petitioner also claims on information and belief that the prosecution purposely
            failed to do testing which would have cast doubt on their theory of the case and
10          failed to provide DNA testing which would have exonerated her.  Petitioner's
            claim in this regard is woefully inadequate as no facts are alleged to support the
11          claim.  Petitioner does not claim the evidence which should have been tested has
            been destroyed, so this does not appear to be a proper claim pursuant to *California
12          v. Trombetta* (1984) 467 U.S. 479.  Petitioner has not stated what evidence the
            People purposely failed to test or what DNA evidence would have exonerated her,
13          nor do they request the right to test any evidence for DNA.  As such, this claim
            must also fail.

14
15   (Lodgment No. 10, In re Dorotik, No. HCN0787, slip op at 3-4.)

16          Petitioner has not shown that the result of any testing would have revealed

17   exculpatory or impeaching evidence.  Rather, she provides bare speculation that testing

18   might have revealed DNA pointing to involvement by someone else in the crime.  At best,

19   the existence of other DNA would support an inference that Petitioner had an accomplice,

20   but would not exculpate Petitioner.  Thus, even assuming the prosecution had some duty to

21   conduct further DNA testing, because there does not exist a "reasonable probability that, had

22   the evidence been disclosed to the defense, the result of the proceeding would have been

23   different," no material evidence was withheld by the prosecution.  *Kyles*, 514 U.S. at 433-34.

24   The Court **FINDS** that the prosecution's decision not to conduct further DNA testing does

25   not constitute a *Brady* violation

26          Based on the foregoing reasoning, this Court **DENIES** Petitioner's writ of habeas

27   corpus based on her allegations of *Brady* violations.

**III. Evidentiary Hearing**

28          In her objections to the R&R, Petitioner requests an evidentiary hearing. [Doc. No.

29.]  In post-AEDPA cases, facts determined by a state court are presumed correct unless rebutted by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).  While a section 2254 petitioner is required to develop the factual basis of her claim in state court proceedings, she has not failed to do so under this section where the state court denied her request for an evidentiary hearing.  *See Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir. 1997). A petitioner who establishes a colorable claim for relief and has never been afforded a state or federal hearing on her claim may be entitled to an evidentiary hearing.  *See Earp v. Ornoski*, 431 F.3d 1158, 1167 (9th Cir. 2005).  However, a district court may deny a petition on the merits without an evidentiary hearing once it has independently reviewed the state court record.  *See Chaney v. Lewis*, 801 F.2d 1191, 1194 (9th Cir. 1986).  An evidentiary hearing is unnecessary when the court has sufficient facts before it to fully and fairly rule on the merits of claims.  *Blackledge v. Allison*, 431 U.S. 63, 74-81 (1977); *see McDonald v. Johnson*, 139 F.3d 1056, 1060 (5th Cir. 1998).

Petitioner requested and was denied an evidentiary hearing in state court.  [Doc. Nos. 17, 29.]  Petitioner has therefore not failed to develop the factual basis of her claim in state court proceedings under section 2254.

Nevertheless, the Court **DENIES** Petitioner's request for an evidentiary hearing. Petitioner has suggested several possible theories of decedent's murder that do not involve Petitioner.  However, her speculation as to events that might have occurred does not amount to the allegation of "specific facts" necessary to show a colorable claim for relief.  *See Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir.1998).

Moreover, this Court has completed an independent review of the state court record and fully and fairly ruled on the merits of Petitioner's claims.  *See Bashor v. Risley*, 730 F.2d 1228, 1233 (9th Cir. 1984) (holding that an evidentiary hearing is not required on issues which can be resolved on the basis of the state court record).  Based on this Court's ruling that Petitioner is not entitled to habeas relief as to any claim presented, the Court **DENIES** Petitioner's request for an evidentiary hearing.

## IV.  Appointment of Counsel

The Sixth Amendment right to counsel does not extend to federal habeas corpus

1  actions by state prisoners.  *See McCleskey v. Zant*, 499 U.S. 467, 495 (1991); *United States v.*

2  *Angelone*, 894 F.2d 1129, 1130 (9th Cir. 1990).  Whether counsel should be appointed turns

3  on the prisoner's ability to articulate her claims in light of the complexity of the legal issues

4  and the likelihood of success on the merits of the petition or motion.  *See Weygandt v. Look*,

5  718 F.2d 952, 954 (9th Cir. 1983).  However, the district court must appoint counsel if an

6  evidentiary hearing is to be held in a section 2254 proceeding.  *See* Rule 8(c), 28 U.S.C. foll.

7  § 2254; *U.S. v. Duarte Higareda*, 68 F.3d 369, 370 (9th Cir. 1995).

8       Petitioner filed a Motion to Appoint Counsel on June 1, 2007, the same day Petitioner

9  filed her Petition for Writ of Habeas Corpus.  [Doc. No. 3.]  On July 23, 2007, Magistrate

10  Judge Porter denied without prejudice Petitioner's request for appointment of counsel.  [Doc.

11  No. 8.]  In her Objections to the R&R, Petitioner again requests the appointment of counsel.

12  [Doc. No. 29.]

13       The Court **DENIES** Petitioner's request for appointment of counsel.  Because the

14  Court **DENIES** Petitioner's writ of habeas corpus and request for an evidentiary hearing,

15  Petitioner has no need for counsel at this time.

16                          *Conclusion*

17       For the reasons above, the Court **ADOPTS** the R&R and **DENIES** Petitioner's writ of

18  habeas corpus, request for an evidentiary hearing, and request for appointment of counsel.

19

20       **IT IS SO ORDERED.**

21

22  DATED: March 9, 2009

23                          _____
24                          HON. NAPOLEON A. JONES, JR.
                            United States District Judge

25

26  cc:  Magistrate Judge Porter
          All Counsel of Record

27

28

                          35                              07cv1007 J (POR)